**UNITED STATES of America,**
**Plaintiff-Appellee,**

**v.**

**Clifford Frank CAMPBELL and John Clifton Free, Defendants-Appellants.**

**No. 27116**
**Summary Calendar.**

United States Court of Appeals
Fifth Circuit.

Dec. 2, 1969.

Thomas M. Hendricks, Jr., Howard Pigford, Meridian, Miss., Perry Hubbard, Hubbard & Waldrop, Tuscaloosa, Ala., for appellants.

Robert E. Hauberg, U. S. Atty., E. Donald Strange and Joseph E. Brown, Jr., Asst. U. S. Attys., Jackson, Miss., for appellee.

Before JOHN R. BROWN, Chief Judge, and THORNBERRY and MORGAN, Circuit Judges.

JOHN R. BROWN, Chief Judge:

 Appellants in this moonshine case argue that questions propounded by the Judge at trial constituted prejudicial error, but they did not object to or otherwise call this claimed error to the attention of the Trial Judge. Under such circumstances the result is an affirmance unless we find plain error. F.R. Crim.P. 52(b). We cannot so we affirm.[1]

Although we are mindful of the fact that a criminal defendant is himself the one who must bear the burdens of imprisonment from actions or inactions of his counsel, whether retained or court appointed, we consider that the plain error rule of 52(b) protects the defendant adequately.

The question, however, arises as to whether the plain error standard should not be relaxed where the claimed sin is prejudicial questioning by the Trial Judge. We are told here by appellants' new counsel that an attorney's reluctance to openly object to active questioning which he feels improper may well be justified out of a fear that he will prejudice his client's case more by the apparent implied criticism of the revered Trial Judge in the eyes of the jury than he would by letting the questions slide. This may be a factor in weighing what constitutes plain error, but it is not a separate basis for excluding this action from the scope of plain error. We conclude that the plain error rule, which this Circuit has applied to such cases (see Kyle v. United States, 5 Cir., 1968, 402 F.2d 443), must still apply "to preclude any possibility of gambling for a favorable verdict and, should the verdict be unfavorable, resorting to appeal on errors which might have been obviated on objection." Kyle, *supra*, at 445.

 Our next task is to determine if there was plain error in this case. In doing so we must determine what we are looking for. Like any other judicial term, "plain error" has been characterized in various manners, for example, "grave errors which seriously affect substantial rights of the accused" (Wright v. United States, 10 Cir., 1962, 301 F.2d 412, 414), "errors that result in a clear miscarriage of justice" (e.g. Mims v. United States, 5 Cir., 1967, 375 F.2d 135, 147), and the most comprehensive of them all, errors that "are obvious, or * * * otherwise seriously affect the fairness, integrity, or public reputation of judicial proceedings." United States v. Atkinson, 1936, 297 U.S. 157, 160, 56 S.Ct. 391, 392, 80 L.Ed. 555, 557. We think this third liberal definition is appropriate in a judicial questioning case because of the special problems of counsel's specifically challenging not just rulings by the Judge, but the nature and extent of his personal participation in the advocate's usual role of witness examination.

The facts leading to trial can be severely compressed. Appellants in this case, Campbell and Free, were caught red-handed along with two other men, Sutton and Hunter, at the site of 356 gallons of moonshine whiskey about 500 yards from Campbell's house in the Whynot area of Lauderdale County, Mississippi. They along with Sutton were indicted and charged in two counts with concealment and possession of tax unpaid whiskey in unstamped containers under 26 U.S.C.A. § 7206(4), 5604(a)(1) and 5205(a)(2). All three were adjudged guilty by jury verdict on both counts, but only Campbell and Free appealed.

The testimony of Sutton (the non-appealing defendant) and of appealing defendant Free showed that they lived in Tuscaloosa, Alabama, which is 90 miles away from Whynot, and were acquainted with non-defendant Hunter, who also

1. Pursuant to Rule 18 of the Rules of this Court, we have concluded on the merits that this case is of such character as not to justify oral argument and have directed the clerk to place the case on the Summary Calendar and to notify the parties in writing. See Murphy v. Houma Well Service, 5th Cir. 1969, 409 F.2d 804, Part I; and Huth v. Southern Pacific Company, 5th Cir. 1969, 417 F.2d 526, Part I.

lived in that area. But the story of each posed its own problems of credulity. Sutton first got involved when Hunter requested him to drive a pickup truck to Mississippi about 10:00 o'clock one night. Because Sutton owed Hunter several hundred dollars, which he had borrowed to help pay for his daughter's illness, he felt obliged to do as Hunter asked. He was to drive the truck and Hunter was to follow in an automobile until they reached their destination, which was unknown to Sutton.

Free got mixed up in the trouble when Sutton began having trouble with the truck's headlights while en route to Whynot. Free owned a truck-stop-service-station-garage just outside Tuscaloosa and Sutton stopped the truck there to have the lights fixed. After fixing the headlights, Free sent Sutton on his way. Hunter, bringing up the rear, stopped there too and implored Free to hop in and go with him to fix the truck lights. Free said he had already fixed them but agreed to go anyway. The men never did stop to fix the lights again. Free, desiring to return to work, suggested that Hunter drive him back to his service station, but Hunter, apparently ignoring these statements, continued to follow Sutton.

Their claim, in essence, was one of complete innocence—that each was there simply because another had asked him to go along. Not denying the sequence of events described without much contradiction appellants' success depended on the jury's buying this story.

The Trial Judge's questions, which appellants through new counsel urge on the Court at this late appellate date, are in three phases. To simplify discussion these are set out separately followed by reference to similar facts brought out by the attorneys on direct, cross, and redirect examination of that or other witnesses, etc.

The first question was propounded to non-appealing defendant Sutton right after telling that he drive Hunter's pickup truck to the destination 90 miles away from Tuscaloosa. The Trial Court asked "Were you paid to make that trip?" whereupon Sutton answered, "Well he never offered me anything, no sir."

Literally there was no testimony prior to the Judge's question showing that pay was expected, but shortly after the Judge's inquiry Sutton's own counsel asked him:

Q. "Did you expect him to pay you something for this trip?"

A. "Well I was in hopes he would. He never did right off tell me he would pay me a sum of money or anything for bringing it down here. Course, I was indebted to him and I couldn't hardly afford to refuse him when he asked me."

After the Judge's question quoted above, the Court asked, again without objection: "So you tell this Court and this jury that [1] you were working a reputable, reliable, dependable job all during the day and [2] riding all over the country at night like this on a job not even knowing where you were going? Is that what you're telling me?" Sutton answered, "Yes, sir. I would like to add this, Your Honor. I was indebted to him."

For ease of reference brackets have been inserted to distinguish the elements inquired about by the Court. As to [1] Sutton testified on direct that he had worked for Southern Bell Telephone & Telegraph Company for 20 years and at the present time was working as a test deskman. This direct testimony from the defendant himself was earlier corroborated by character witnesses offered by him. One was an attorney who had known Sutton for six years and knew that he had worked a long time for the telephone company. Another was a management employee in Southern Bell Telephone Company who had known Sutton for 17 years, and knew where he lived and worked.

As to element [2] Sutton had already testified in detail:

Q. "And did you follow him [Hunter]?"

A. "Yes sir."

Q. "Did you know where you were going?"

A. "No sir, never been there."

Q. "Did you know why you were following him?"

A. "No sir."

Q. "And where did you finally wind up?"

A. "They say it was Whynot or something like that over here."

Q. "Did you know exactly where you were?"

A. "No sir, I didn't know where I was."

Q. "Did you go straight to this place? Did he know where you were going, or did you wind around or how did you get there?"

A. "No sir, we done a lot of turning on back roads first one way and another. It was new to me and we, he actually left the highway at Number 11 Highway up here at Cuba, left the main highway at Cuba, a little place right over the state line up there a little way. He made a left turn there and he went, I don't know how many turns I made in there."

Q. "All right, sir."

A. "On different roads."

Q. "When you finally stopped, where were you?"

A. "We was not too far from where we got caught when he finally stopped."

Even more significant, guided by questions put by his own counsel, Sutton had characterized the occurrence as strange and bizarre.

Q. [By Sutton's own counsel]: "Let me ask you right at this point. Have you ever made any trips like that for him or anyone else?"

A. "No sir."

Q. "In your whole life?"

A. "No sir."

Q. "Did you think this was a little unusual, or not?"

A. "Sir?"

Q. "Did you think this was a little unusual or not, making a trip like that at night for him?"

A. "Yes sir, to a certain degree I did."

Thus a detailed matching of the evidence in the record against that which was elicited from the Court's own question reveals that not a new single fact came forth. And if it is urged that, reconstructed from its mere written form, the general tone of the question was to indicate the Judge's disbelief of the story and imply an incredulity on the Judge's part, the defendant at the hands (and mouth) of his own counsel had already done that more effectively than anyone else could.

The second question to which appellants object was also directed at non-appellant Sutton and went like this: "How far were you from Tuscaloosa, your home, at one o'clock on the night that you all were caught with this whiskey?" Sutton answered that his house was about 11 miles south of Tuscaloosa and about 80 miles from Whynot.

This question was aimed at evoking an uncontradicted geographical fact—one that came out later on Sutton's cross-examination and is easily verified by a roadmap, which shows the distance from Tuscaloosa to Whynot to be 90 miles. There was nothing harmful in the question and answer.

The third set of questions was propounded to appellant Free after he had testified on cross-examination that Hunter would not return him to his post.

Court: "Did Hunter kidnap you, is that what you're trying to tell us?"

Free: "He didn't kidnap me, he just told me said come on and ride down the road with me, said we'll be back within an hour."

Court: "Didn't force you to do anything you didn't want to do, did he?"

Free: "He didn't force me. Wasn't nothing I could do, I was in the car with him but ride with him or walk back, sir."

But the defendant Free had already volunteered nearly everything in response to brief questions by his own counsel:

A. "* * * Mr. Hunter comes up later, says, man, let's go get them lights fixed. I said them lights are all right. He said come on, we ain't going to be gone but about an hour, come on, it won't hurt you. I worked on truck then, got through with it, got in the car with him and went on down the road. We overtook Mr. Sutton down there and the lights was on. I told him, I said I need to be back to work."

On cross-examination Free testified:

Q. "So you rode a hundred miles with him trying to correct that light trouble?"

A. "I did. At the time, I didn't know how far I was going. He said let's ride down the road. He didn't say we're going nowhere. We got down there, I said let's go back, I said ain't no way to make it back in a hour, I had work to do. Oh, we're just going right down here, just going right down here."

It was in this context that the Judge put the questions stated above. In this setting this was not a hostile inquiry. Perhaps the word "kidnapped" was unfortunate, but it was entirely proper for the Court to make the record clear whether the defendant was contending that he was then under some sort of physical coercion and restraint of a kind which would be encompassed within a loose use of the word "kidnapped."

Immediately thereafter the Court then asked him this question:

Court: "Were you keeping track of your time after you left your station working on his lights with the idea of charging him for that service?"

Free: "I was expecting to charge him for the service, yes sir."

Court: "Did you ever give him a bill for it?"

Free: "No sir."

Literally, there was no other testimony precisely on this point but since his own testimony showed that he ran a service station and a garage and since Sutton brought the truck in for him to fix the lights and he undertook to fix them, there was an obvious implication that he expected to do it for compensation. The Judge's inquiry was an innocuous one on a non-provocative fact.

■ An analysis, question by question, thus demonstrates that neither by volume, content, form, or verbal tone, did the Court put questions to elicit information not already substantially stated or to raise doubts or suggestions bearing upon the acceptability of this unusual explanation.

This Court is vigilant in keeping the Judge's participation in bounds as our recent decision in United States v. Lanham, 5 Cir., 1969, 416 F.2d 1140 bears out. See also Travelers Insurance Co. v. Ryan, 5 Cir., 1969, 416 F.2d 362. Cf. United States v. Hill, 5 Cir., 1969, 417 F.2d 279. But, the actions of the Trial Judge here were quite in keeping with the standards set forth in detail in those cases.

Affirmed.