**UNITED STATES of America, Plaintiff-Appellee,**

v.

**Irby Frank DUNCAN, Defendant-Appellant.**

**No. 27131.**

United States Court of Appeals Fifth Circuit.

Jan. 8, 1970.

Thomas M. Hendricks, Jr., Joe R. Odom, Gerald Adams, Meridian, Miss., for defendant-appellant.

Robert E. Hauberg, U. S. Atty., Southern District of Mississippi, E. Donald Strange, Joseph E. Brown, Jr., Asst. U. S. Attys., Jackson, Miss., for plaintiff-appellee.

Before RIVES, BELL and DYER, Circuit Judges.

RIVES, Circuit Judge.

Irby Frank Duncan resided with his wife and children in the Lost Gap section of Lauderdale County, Mississippi, about 2½ or 3 miles west of the Meridian City limits and across the road from the Lost Gap Church. Charles Moseley, a

Special Investigator for the Alcohol and Tobacco Tax Division of the Treasury Department (hereafter ATU), testified that, "based on information which I had received from a source I knew to be reliable and confidential, I sent Special Investigator Glenn Fleming and Grady Lewis and Peter Mastin out in this area to make an investigation." Moseley himself checked the land records of Lauderdale County, and found 39 acres listed as owned jointly by Irby Frank Duncan and his wife. The other one acre of the forty is the situs of the Lost Gap Church across the road from the Duncan home.

The investigation was prompt. By 2:30 P.M., Glenn Fleming was about 250 feet from a chicken house which is located some 200 to 250 feet behind the Duncan residence. Fleming testified:

> "From this position, I could smell the odor of fermenting mash. I could hear a burner going on in the chicken house and I could hear glass being moved about, clinking together; and I could see a black plastic pipe coming out of the chicken house and going to, down to the stream at the bottom of the hill. * * * Actually there were two plastic hose coming out, one out one side and one out the other. One is a drain and one is used as water to supply the fermenting mash."

Fleming had been an ATU Investigator for three years, during which time he had investigated "close to a hundred" illicit whiskey stills. The sound of burners was a familiar sound to him and indicated that a distillery was in operation. By radio contact, Fleming informed Investigator Moseley of what he had observed and smelled, and requested that Moseley get a search warrant for the premises.

Moseley, having thus corroborated the information which he had received from his "reliable informant," executed an affidavit for the search warrant before United States Commissioner Richard E. Wilbourn. Commissioner Wilbourn, out of curiosity or for some undisclosed reason, accompanied the officers who executed the search warrant.

About five o'clock P.M. on the same day, five or six officers in two automobiles converged on the Duncan residence. As they started walking toward the house, Irby Frank Duncan came out to meet them. After mutual introductions, according to Moseley's testimony, "I identified myself to him and informed him that I was armed with a federal search warrant for his premises, whereupon he immediately stated, what you are looking for is in the chicken house." Moseley then gave Duncan a copy of the search warrant which he retained, and Investigator Owen advised Duncan of his constitutional rights. All of the group then proceeded to the chicken house. Moseley testified:

> " * * * [W]e walked along an old road which led from his house to the chicken house, but it hadn't been driven on lately but there was considerable walking traffic on this path. * * * When I entered the chicken house, I observed a large distillery at which no sign was posted to indicate that it was registered. The distillery consisted of a seven hundred twenty gallon vat still which was set up and in operation. The fire was under the still and the whiskey was flowing from the condenser into a catch vat. Uh there were one hundred and seventeen 55 gallon steel drum fermenters. * * * Uh well there was a total of five thousand two hundred and fifty gallons of mash contained in uh the fermenters and the still. And there was a total of 50 gallons of distilled spirts uh contained in one 180 gallon mixing vat which bore no stamps, tax stamps of any kind. * * * Just outside and to the front of the chicken house, there was a 1958 Chevrolet three quarter ton pickup truck which contained a two hundred and fifty gallon butane tank. The butane tank was connected to the burner which was under the still and which was lighted by a long pipe which ran down the side of the

**330**

chicken house and was connected through this wall with a plastic or rubber pipe. This 1958 Chevrolet was registered to Irby Frank Duncan at his present address."

When they entered the chicken house and found the distillery, Moseley advised Duncan that he was under arrest. No further confession or statement of Duncan was offered in evidence. Moseley described on cross-examination the circumstances under which Duncan's one brief statement was made:

"Q. * * * And you say he just voluntarily made a statement when you walked up?

A. Spontaneously.

Q. Spontaneously?

A. Yes sir.

Q. You don't think he was afraid?

A. He didn't appear to be. He was quite calm during the whole thing.

Q. And then when was he given this warning that you mentioned?

A. As to his rights?

Q. Yes.

A. Immediately after he made the statement."

Moseley could see at the house some children and a woman whom he took to be Duncan's wife, but none of the officers went into the home.

Investigators Fleming and Owen corroborated Moseley's testimony. With the testimony of those three officers the government rested its case. Duncan's counsel moved for his acquittal on the ground of insufficiency of the evidence, which motion was overruled by the court. After a brief recess the defendant rested his case without offering any evidence. Arguments of counsel and the charge of the court followed. At the conclusion of the charge, in the absence of the jury the following colloquy occurred between the court and counsel:

"BY THE COURT: Does the government have any exceptions to take to any instructions given?

BY MR. STRANGE [Assistant U. S. Attorney]: No, Your Honor.

BY THE COURT: Does the government have any additional instructions to request?

BY MR. STRANGE: No, Your Honor.

BY THE COURT: Defendant have any exceptions to take to any instructions given?

BY MR. PIGFORD [Counsel for Duncan]: May it please the Court, the defendant excepts to the statement of the Court during the charge to the jury in discussing I believe it was the first, the count concerning the mash the statement of the Court to the jury that to this effect that you heard the testimony that the officers said he had the mash in his possession to which we except to that instruction, that statement, Your Honor, and in the discussion with the jury of the possession or what possession meant the statement of the Court in which the statement was I think in these exact words that the still was in actual operation at this time on this man's property.

BY THE COURT: Yes sir.

BY MR. PIGFORD: We would request an exception to those two statements.

BY THE COURT: Yes sir. I think your observation is substantially correct and I will note your exception to it. Is that all you have?

BY MR. PIGFORD: Yes sir.

BY THE COURT: Do you have any additional instructions to request?

BY MR. PIGFORD: No sir."

The jury returned a verdict finding the defendant guilty as charged in each of the five counts. The court sentenced the defendant to three years on each count, the terms of imprisonment to run concurrently, but specified that he would be eligible for parole at such time as the board of parole may determine.[1]

---

1. Pursuant to 18 U.S.C. § 4208(a) (2).

On appeal the defendant makes three contentions: (1) The district court should have sustained the motion to suppress the evidence made prior to the trial because the United States Commissioner who issued the search warrant was not neutral or detached; (2) there is not sufficient evidence to sustain the verdict of guilty; and (3) the defendant did not receive a fair and impartial trial.

The foregoing full statement of the case obviates the necessity of any lengthy discussion of defendant's three contentions.

■ (1) In support of his first contention the defendant relies solely on the quotation in Aguilar v. Texas, 1964, 378 U.S. 108, 111, 84 S.Ct. 1509, 12 L.Ed. 2d 723, from the opinion in Johnson. v. United States, 1948, 333 U.S. 10, 13–14, 68 S.Ct. 367, 369, 92 L.Ed. 436:

"'The point of the Fourth Amendment, which often is not grasped by zealous officers, is not that it denies law enforcement the support of the usual inferences which reasonable men draw from evidence. Its protection consists in requiring that those inferences be drawn by a neutral and detached magistrate instead of being judged by the officer engaged in the often competitive enterprise of ferreting out crime.'"

The fact that the Commissioner accompanied the officers on the raid is not sufficient to impugn his neutrality or detachment. His act was somewhat similar to visits often made by judges to places of imprisonment. It may indeed be a healthy interest on the part of a judge or magistrate actually to see the manner in which his orders are carried out. The proof does not remotely indicate that, in issuing the search warrant, the Commissioner did not act as a neutral and detached magistrate.

(2) No discussion is necessary to demonstrate that the evidence in this case was substantial, indeed ample, to support a verdict of guilty.[2]

■ (3) The defendant urges that remarks of the Trial Judge during the testimony and in his charge deprived him of a fair and impartial trial. While some of the Judge's comments were not phrased in customary judicial language, they drew no objection from the defendant's counsel.[3]

The Judge carefully charged the jury that " * * * you as jurors are the sole judges of the facts. * * * " We think that the Judge's most damaging comment was:

"You heard the facts. I am entitled to comment on that and that is my comment that the evidence does show a violation of every one of those statutes, but you are at liberty to disregard my comments on the evidence. I am entitled to comment but you are entitled to disregard my comment but my comments are intended for your help and to assist you in a proper performance of your duty."

Under all of the facts and circumstances of this case, we find no miscarriage of justice and no plain error.[4]

The judgment is

Affirmed.

2. *See* Glasser v. United States, 1942, 315 U.S. 60, 80, 62 S.Ct. 457, 86 L.Ed. 680; Riggs v. United States, 5 Cir. 1960, 280 F.2d 949, 955. The jury could reasonably conclude that the evidence excluded every reasonable hypothesis except that of guilt. Vick v. United States, 5 Cir. 1954, 216 F.2d 228, 232.

3. The only objection was that made to the Judge's charge, supra, and there is no particular insistence upon that objection.

4. See Rule 52, Fed.R.Crim.P.; United States v. Campbell and Free, 5 Cir. 1969, 419 F.2d 1144 (decided Dec. 2, 1969).