UNITED STATES, Appellee,

v.

Elijah D. EZELL, Jr., Private, U. S.
Army, Appellant.

UNITED STATES, Appellee,

v.

Phil L. BOSWELL, Private First Class,
U. S. Army, Appellant.

UNITED STATES, Appellee,

v.

Edward V. SANCHEZ, Private, U. S.
Marine Corps, Appellant.

UNITED STATES, Appellee,

v.

Lonnie L. BROWN, Sergeant, U. S. Air
Force, Appellant.

Nos. 31,304, 32,414, 33,326, 33,679.
CM 432699, SPCM 11087, NCM
76–0838, ACM 22036.

U. S. Court of Military Appeals.

April 9, 1979.

For Appellant (Ezell)—*Captain John R. Osgood* (argued); *Colonel Alton H. Harvey* (on brief); *Captain Willard E. Nyman, III.*

For Appellee—*Captain Richard A. Gallivan* (argued); *Lieutenant Colonel Donald W. Hansen, Major John T. Sherwood, Jr., Captain Gary F. Thorne* (on brief); *Colonel Thomas H. Davis, Lieutenant Colonel R. R. Boller, Captain Laurence M. Huffman.*

For Appellant (Boswell)—*Captain Derryl W. Peden* (argued); *Colonel Alton H. Harvey, Captain John C. Carr* (on brief); *Lieutenant Colonel John R. Thornock, Captain Michael B. Dinning.*

For Appellee—*Captain Richard A. Cefola* (argued); *Colonel Thomas H. Davis, Captain John F. DePue* (on brief); *Lieutenant Colonel Donald W. Hansen, Major John T. Sherwood, Jr., Captain Keith H. Jung.*

For Appellant (Sanchez)—*Captain Eugene A. Ritti,* USMCR (argued).

For Appellee—*Lieutenant H. S. Pointer,* JAGC, USN (argued); *Lieutenant Commander N. P. DeCarlo,* JAGC, USN (on brief); *Lieutenant Colonel P. N. Kress,* USMC.

For Appellant (Brown)—*Major Bruce R. Houston* (argued); *Colonel Robert W. Norris* (on brief).

For Appellee—*Major Alvin E. Schlechter* (argued); *Colonel Julius C. Ullerich, Jr., Captain Edward F. Rodriguez, Jr.* (on brief).

Opinion

PERRY, Judge:

We granted review in these cases to consider identical claims, made by the appellants, that evidence leading to their convictions was seized during searches authorized by commanding officers who, by reason of their involvement in ferreting out evidence of crime, were not neutral and detached magistrates and that hence the evidence was obtained in violation of the Fourth Amendment to the Constitution of the United States. A further claim is made that military commanders are inherently devoid of neutrality and detachedness because of a conflict between their attendant duties as commanding officers and the requirement of the Fourth Amendment that search warrants be issued only by neutral and detached magistrates. We are, therefore, urged to rule that for these and other reasons commanding officers are *per se* disqualified to authorize searches and seizures of evidence of crime. The importance of that question throughout the military serv-

ices is underscored by the arguments set forth in the splendid briefs filed on behalf of the parties and by the various *amici curiae*. For the reasons set forth herein, we decline to hold that commanding officers are *per se* disqualified to serve as neutral and detached magistrates. However, review of the records leads us ineluctably to the conclusions that the commanding officers who authorized the searches in case numbers 32,414 (*Boswell*); 33,326 (*Sanchez*) and 33,679 (*Brown*) were not neutral and detached magistrates. It follows that the authorizations to search in those cases were invalid and that the searches and seizures of evidence leading to the convictions therein were made in violation of the Fourth Amendment. In the case of *United States v. Ezell*, Number 31,304, we have determined that the commander acted as an impartial magistrate and that decision is, accordingly, affirmed.

## I

We consider first the appellants' contention that military commanders are inherently incapable of being neutral and detached as required by the Fourth Amendment. At the forefront of that consideration is the very language of the Fourth Amendment:[1]

> The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.

The United States Supreme Court, which we acknowledge as the ultimate authority concerning the meaning of the Constitution, has stated that "[t]he warrant clause of the Fourth Amendment is not dead language. Rather, it has been 'a valued part of our constitutional law for decades, and it has determined the result in scores of cases in courts all over this country. . . .'"[2]

The command that a warrant should issue only upon probable cause directs that baseless searches shall not be made. *United States v. United States District Court*, 407 U.S. 297, 92 S.Ct. 2125, 32 L.Ed.2d 752 (1972). Thus, the Court has stated in *United States v. Chadwick*, 433 U.S. 1, 9, 97 S.Ct. 2476, 2482, 53 L.Ed.2d 538 (1977), that the

> fundamental inquiry in considering Fourth Amendment issues is whether or not a search or seizure is reasonable under all the circumstances. . . . The judicial warrant has a significant role to play in that it provides the detached scrutiny of a neutral magistrate, which is a more reliable safeguard against improper searches than the hurried judgment of a law enforcement officer "engaged in the often competitive enterprise of ferreting out crime." *Johnson v. United States*, 333 U.S. 10, 14, 68 S.Ct. 367, 369, 92 L.Ed. 436 (1948). Once a lawful search has begun, it is also far more likely that it will not exceed proper bounds when it is done pursuant to a judicial authorization "particularly describing the place to be searched and the persons or things to be seized." Further, a warrant assures the individual whose property is searched, or seized, of the lawful authority of the executing officer, his need to search, and the limits of his power to search. *Camara v. Municipal Court*, 387 U.S. 523, 532, 87 S.Ct. 1727, 18 L.Ed.2d 930 (1967).

Inherent in the warrant requirement is the prerequisite that it be issued "by a neutral and detached magistrate." *Johnson v. United States, supra* 333 U.S. at 14, 68 S.Ct. at 369. *See also United States v. Chadwick, supra*; *Gerstein v. Pugh*, 420 U.S. 103, 95 S.Ct. 854, 43 L.Ed.2d 54 (1975); *Shadwick v. City of Tampa*, 407 U.S. 345, 350, 92 S.Ct. 2119, 32 L.Ed.2d 783 (1972); *United States v. United States District Court, supra* 407 U.S. at 318, 92 S.Ct. 2125; *Coolidge v. New Hampshire*, 403 U.S. 443, 449–53, 91 S.Ct. 2022, 29 L.Ed.2d 564 (1971);

---

1. U.S.Const. amend. IV.

2. *United States v. United States District Court*, 407 U.S. 297, 315, 92 S.Ct. 2125, 2136, 32 L.Ed.2d 752 (1972).

*Warden v. Hayden,* 387 U.S. 294, 87 S.Ct. 1642, 18 L.Ed.2d 782 (1967); *United States v. Ventresca,* 380 U.S. 102, 85 S.Ct. 741, 13 L.Ed.2d 684 (1965); *Jones v. United States,* 362 U.S. 257, 80 S.Ct. 725, 4 L.Ed.2d 697 (1960).

Perhaps the most classic explanation of the policy was set forth by Mr. Justice Jackson in *Johnson v. United States, supra* 333 U.S. at 13–14, 68 S.Ct. at 369 (footnotes omitted):

> The point of the Fourth Amendment, which often is not grasped by zealous officers, is not that it denies law enforcement the support of the usual inferences which reasonable men draw from evidence. Its protection consists in requiring that those inferences be drawn by a neutral and detached magistrate instead of being judged by the officer engaged in the often competitive enterprise of ferreting out crime. Any assumption that evidence sufficient to support a magistrate's disinterested determination to issue a search warrant will justify the officers in making a search without a warrant would reduce the Amendment to a nullity and leave the people's homes secure only in the discretion of police officers. . . . When the right of privacy must reasonably yield to the right of search is, as a rule, to be decided by a judicial officer, not by a policeman or Government enforcement agent.

To emphasize the importance of the requirement that the officer who issues the warrant in fact be neutral and detached, the Supreme Court has stated:[3]

The Fourth Amendment does not contemplate the executive officers of Government as neutral and disinterested magistrates. Their duty and responsibility is to enforce the laws, to investigate, and to prosecute. . . . But those charged with this investigative and prosecutorial duty should not be the sole judges of when to utilize constitutionally sensitive means in pursuing their tasks.

In *Shadwick v. City of Tampa, supra,* the Court held that clerks of the Municipal Court qualified as neutral and detached magistrates because they had "no connection with any law enforcement activity or authority which would distort the independent judgment the Fourth Amendment requires." *Id.* 407 U.S. at 350–51, 92 S.Ct. at 2123. Recognizing that prior decisions of the Court, in describing the warrant requirement, had indicated the necessity of establishing probable cause before a "judicial officer,"[4] it was noted that sometimes the phrase "judicial officer" was "used interchangeably with" the term "magistrate."[5] Other cases used the former term "simply to underscore the now accepted fact that someone independent of the police and prosecution must determine probable cause."[6] Noting that it had frequently used "the term 'magistrate' to denote those who may issue warrants,"[7] the Court observed that the term "has been defined broadly as 'a public civil officer, possessing such power—legislative, executive or judicial—as the government appointing him may ordain,' . . . or, in a narrower sense 'an inferior judicial officer, such as a

---

3. *Id.* 407 U.S. at 317, 92 S.Ct. at 2136.

4. *Whiteley v. Warden,* 401 U.S. 560, 564, 91 S.Ct. 1031, 28 L.Ed.2d 306 (1971); *Katz v. United States,* 389 U.S. 347, 356, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967); *Wong Sun v. United States,* 371 U.S. 471, 481–82, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963); *Jones v. United States,* 362 U.S. 257, 270, 80 S.Ct. 725, 4 L.Ed.2d 697 (1960); *Johnson v. United States,* 333 U.S. 10, 14, 68 S.Ct. 367, 92 L.Ed. 436 (1948).

5. *Katz v. United States, supra; Johnson v. United States, supra.*

6. *Wong Sun v. United States, supra; Jones v. United States, supra.*

7. *Coolidge v. New Hampshire,* 403 U.S. 443, 449–53, 91 S.Ct. 2022, 29 L.Ed.2d 783 (1971); *Whiteley v. Warden, supra,* 401 U.S. at 566, 91 S.Ct. 1031; *Katz v. United States, supra,* 389 U.S. at 356–57, 88 S.Ct. 507; *United States v. Ventresca,* 380 U.S. 102, 108, 85 S.Ct. 741, 13 L.Ed.2d 685 (1965); *Giordenello v. United States,* 357 U.S. 480, 486, 78 S.Ct. 1245, 2 L.Ed.2d 1503 (1958); *Johnson v. United States, supra,* 333 U.S. at 13–14, 68 S.Ct. 367; *United States v. Lefkowitz,* 285 U.S. 452, 464, 52 S.Ct. 420, 76 L.Ed. 877 (1932).

justice of the peace.' . . . ."[8] Finding "no commandment in either term, however, that all warrant authority must reside exclusively in a lawyer or judge,"[9] the Court stated that a "warrant traditionally has represented an independent assurance that a search and arrest will not proceed without probable cause to believe that a crime has been committed and that the person or place named in the warrant is involved in the crime." Therefore, minimum requirements for officials issuing warrants for purposes of the Fourth Amendment are being (1) "neutral and detached"[10] as well as (2) "capable of determining" the existence of probable cause to arrest or search. "If . . . detachment and capacity do conjoin," the Court emphasized, "the magistrate has satisfied the Fourth Amendment's purpose."[11]

In other cases, the Supreme Court has made it clear that the warrant requirement cannot be avoided by securing search authority from officials of the Executive Branch. Thus, in *United States v. United States District Court, supra,* the Supreme Court voided the practice of the President of the United States, acting through the Attorney General and without prior judicial approval, of authorizing domestic electronic surveillance, even though done in the interest of avoiding internal subversion of the Government. Said the Court:[12]

> The Fourth Amendment does not contemplate the executive officers of Government as neutral and disinterested magistrates. Their duty and responsibility are to enforce the laws, to investigate, and to prosecute.

And in *Mancusi v. DeForte,* 392 U.S. 364, 88 S.Ct. 2120, 20 L.Ed.2d 1154 (1968), the Supreme Court held that a *subpoena duces tecum* issued by a prosecuting attorney could not qualify as a search warrant since that official was not a neutral and detached magistrate. Similarly, in *Coolidge v. New Hampshire, supra,* the Supreme Court invalidated a search warrant issued by the State Attorney General who was specifically designated a Justice of the Peace by statute, but who personally directed the investigation and later became the chief prosecutor in the case.

Thus, the view of the United States Supreme Court is that the official exercising the warrant authority of the Fourth Amendment must be neutral and detached.[13] Such a person must be capable of determining probable cause and must be completely severed from law-enforcement and prosecutorial functions. The Fourth Amendment clearly does not contemplate an authorizing official as being part of the law enforcement or prosecutorial function,[14] since:

> [t]he historical judgment, which the Fourth Amendment accepts, is that unreviewed executive discretion may yield too readily to pressures to obtain incriminating evidence and overlook potential invasions of privacy and protected speech.[15]

So important is the requirement that search warrants be issued by neutral and detached magistrates that the Court has held that warrantless searches are unreasonable and, therefore, unconstitutional. *United States v. Chadwick, supra.* The Court has, of course, promulgated a few exceptions to the warrant requirement. *Chambers v. Maroney,* 399 U.S. 42, 90 S.Ct. 1975, 26 L.Ed.2d 419 (1970); *Chimel v. California,* 395 U.S. 752, 89 S.Ct. 2034, 23 L.Ed.2d 685 (1969); *Terry v. Ohio,* 392 U.S.

---

**8.** *Compton v. Alabama,* 214 U.S. 1, 7, 29 S.Ct. 605, 53 L.Ed. 885 (1909).

**9.** 407 U.S. 345, 349, 92 S.Ct. 2119, 2122, 32 L.Ed.2d 783 (1972).

**10.** "[N]eutrality and detachment . . . require severance and disengagement from activities of law enforcement." *Id.* at 350, 92 S.Ct. at 2123.

**11.** *Id.*

**12.** *United States v. United States District Court, supra,* 407 U.S. at 316–17, 92 S.Ct. at 2136.

**13.** *See* text at note 10.

**14.** *Id.*

**15.** *United States v. United States District Court, supra* at 317, 92 S.Ct. at 2136.

1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968); *Katz v. United States,* 389 U.S. 347, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967); *McDonald v. United States,* 335 U.S. 451, 69 S.Ct. 191, 93 L.Ed. 153 (1948); *Carroll v. United States,* 267 U.S. 132, 45 S.Ct. 280, 69 L.Ed. 543 (1925). Generally, those which have been created "serve the legitimate needs of law enforcement officers to protect their own well-being and preserve evidence from destruction." *United States v. United States District Court, supra* 407 U.S. at 318, 92 S.Ct. at 2136. But the existence of these exceptions does not impugn the oft-repeated "principle that the 'police must, whenever practicable, obtain advance judicial approval of searches and seizures through the warrant procedure,' *Terry v. Ohio, supra,* 392 U.S. at 20, 88 S.Ct. at 1879; *Chimel v. California, supra,* 395 U.S. at 762, 89 S.Ct. [2034] at 2039." *Id. See United States v. Chadwick, supra.*

 It is now settled that the protections of the Fourth Amendment and, indeed, the entire Bill of Rights,[16] are applicable to the men and women serving in the military services of the United States unless expressly or by necessary implication they are made inapplicable. *Burns v. Wilson,* 346 U.S. 137, 73 S.Ct. 1045, 97 L.Ed. 1508 (1953); *United States v. Jacoby,* 11 U.S.C.M.A. 428, 29 C.M.R. 244 (1960). When a party urges that a different rule obtains in the military than in the civilian sector, the burden is upon that party to show the need for such a variation. *Courtney v. Williams,* 1 M.J. 267 (C.M.A.1976). Thus, in *United States v. Priest,* 21 U.S.C.M.A. 564, 45 C.M.R. 338 (1972), this Court held that the protections of the First Amendment are of different application in the military than within the civilian community.[17] *See also Parker v. Levy,* 417 U.S. 733, 94 S.Ct. 2547, 41 L.Ed.2d 439 (1974); *United States v. Gray,* 20 U.S.C.M.A. 63, 42 C.M.R. 255 (1970). And in *Middendorf v. Henry,* 425 U.S. 25, 96 S.Ct. 1281, 47 L.Ed.2d 556 (1976), the Supreme Court held that the protections of the Sixth Amendment do not apply at summary courts-martial because, in the view of the Court, summary courts-martial are not criminal but disciplinary proceedings which involve minor military offenses having no counterparts in the civilian community.[18]

But neither this Court nor the United States Supreme Court has ever held that the protection of the Fourth Amendment does not apply to servicepersons, save in those instances where the concept of military necessity was held to warrant inapplicability.[19] Indeed, the opposite is true. Thus, in *United States v. Poundstone,* 22 U.S.C.M.A. 277, 279, 46 C.M.R. 277, 279 (1973), Judge Quinn rejected an assertion

---

**16.** U.S.Const. amends. I–X.

**17.** In *United States v. Priest,* 21 U.S.C.M.A. 564, 570, 45 C.M.R. 338, 344 (1972), Judge Darden observed:

In the armed forces some restrictions exist for reasons that have no counterpart in the civilian community. Disrespectful and contemptuous speech, even advocacy of violent change, is tolerable in the civilian community, for it does not directly affect the capacity of the Government to discharge its responsibilities unless it both is directed to inciting imminent lawless action, and is likely to produce such action. *Brandenburg v. Ohio,* [395 U.S. 444, 89 S.Ct. 1827, 23 L.Ed.2d 430 (1969)]. In military life, however, other considerations must be weighed. The armed forces depend on a command structure that at times must commit men to combat, not only hazarding their lives but ultimately involving the security of the Nation itself. Speech that is protected in the civil population may nonetheless undermine the effec-

tiveness of response to command. If it does, it is constitutionally unprotected.

**18.** *See also United States v. Booker,* 5 M.J. 238 (C.M.A.1977), reconsideration granted 5 M.J. 246 (C.M.A.1978).

**19.** *See United States v. Unrue,* 22 U.S.C.M.A. 466, 469, 47 C.M.R. 556, 559 (1973), where Judge Quinn recognized

[t]wo kinds of military necessity situations relevant to [the search under consideration] are: (1) A search to protect the security of the command. *United States v. Brown,* 10 U.S.C.M.A. 482, 28 C.M.R. 48 (1959); *United States v. Gaddis,* 41 C.M.R. 629 (ACMR 1969); cf. *United States v. Poundstone,* 22 U.S.C.M.A. 277, 46 C.M.R. 277 (1973); (2) An administrative inspection to effectuate a proper military regulatory program. *United States v. Kazmierczak,* 16 U.S.C.M.A. 594, 37 C.M.R. 214 (1967).

that members of the armed forces have no protection against unreasonable search and seizure in a war zone during hostilities, but observed that "[c]ertainly, armed conflict and its effects may make reasonable Government action in a war zone that would be unreasonable within the peaceful geographical limits of the United States," citing *Dorr v. United States*, 195 U.S. 138, 24 S.Ct. 808, 49 L.Ed. 128 (1904), and *United States v. Vierra*, 14 U.S.C.M.A. 48, 33 C.M.R. 260 (1963). But he emphasized [20]

> [t]hat is not to say . . . there is no protection whatever against any kind of search and seizure. Our cases are to the contrary. We have consistently recognized the right to be free from unreasonable search and seizure, both in areas of tranquility within the boarders of friendly nations and in areas of combat against an acknowledged enemy.

Indeed, the protections of the Fourth Amendment have been applied by this Court to military personnel in a variety of situations. *United States v. Grosskreutz*, 5 M.J. 344 (C.M.A.1978); *United States v. Harris*, 5 M.J. 44 (C.M.A.1978); *United States v. Roberts*, 2 M.J. 31 (C.M.A.1976); *Courtney v. Williams, supra; United States v. Thomas*, 1 M.J. 397 (C.M.A.1976); *United States v. Jordan*, 1 M.J. 334 (C.M.A.1976); *United States v. Kinane*, 1 M.J. 309 (C.M.A. 1976); *United States v. Guerette*, 23 U.S.C.

M.A. 281, 49 C.M.R. 530 (1975); *United States v. Staggs*, 23 U.S.C.M.A. 111, 48 C.M.R. 672 (1974); *United States v. Unrue*, 22 U.S.C.M.A. 466, 47 C.M.R. 556 (1973); *United States v. Glenn*, 22 U.S.C.M.A. 295, 46 C.M.R. 295 (1973); *United States v. Simmons*, 22 U.S.C.M.A. 288, 46 C.M.R. 288 (1973); *United States v. Poundstone, supra; United States v. Sam*, 22 U.S.C.M.A. 124, 46 C.M.R. 124 (1973); *United States v. Lange*, 15 U.S.C.M.A. 486, 35 C.M.R. 458 (1965); *United States v. Hartsook*, 15 U.S.C.M.A. 291, 35 C.M.R. 263 (1965); *United States v. Davenport*, 14 U.S.C.M.A. 152, 33 C.M.R. 364 (1963); *United States v. Battista*, 14 U.S.C.M.A. 70, 33 C.M.R. 282 (1963); *United States v. Ness*, 13 U.S.C.M.A. 18, 32 C.M.R. 18 (1962); *United States v. Vierra, supra.*

Paragraph 152, Manual for Courts-Martial, United States, 1969 (Revised edition), designates the "commanding officer, including an officer in charge, having control over the place where the property or person searched is situated or found" as the official who may, upon probable cause, authorize searches.[21] Most of the cases that have come to this Court challenging the authorization to search have involved the exercise of authority by the commander or his subordinate. *United States v. Staggs, supra.*[22] With respect to the performance of his duty in the finding of probable cause and of authorizing searches, this Court has held

---

**20.** *United States v. Poundstone, supra* at 279, 46 C.M.R. at 279.

**21.** Paragraph 152 of the Manual for Courts-Martial, United States 1969 (Revised edition), enumerates, among others, those searches which are to be deemed lawful:

> A search of any of the following three kinds which has been authorized upon probable cause by a commanding officer, including an officer in charge, having control over the place where the property or person searched is situated or found or, if that place is not under military control, having control over persons subject to military law or the law of war in that place:
>
> (1) A search of property owned, used, or occupied by, or in the possession of, a *person* subject to military law or the law of war, the property being situated in a military installation, encampment, or vessel or some other place under military control or

situated in occupied territory or a foreign country.

> (2) A search of the person of anyone subject to military law or the law of war who is found in any such place, territory, or country.
>
> (3) A search of military property of the United States, or of property of nonappropriated fund activities of an armed force of the United States.

The commanding officer may delegate to persons of his command, or made available to him, the general authority to order searches upon probable cause, and a search ordered by virtue of any such delegation is to be considered as having been authorized by the commanding officer. Any such delegation should be made to an impartial person. The person who orders a search need not himself make or be present at the search.

**22.** *See* text and case citations following footnote 20, *ante.*

that the commanding officer stands in the same position as his civilian counterpart, the federal magistrate. *United States v. Staggs, supra; United States v. Sam, supra.* And we have also held that the search authority conferred by paragraph 152 of the Manual, *supra,* must be carried out with "a 'judicial' rather than with a 'police' attitude." *United States v. Drew,* 15 U.S.C. M.A. 449, 454, 35 C.M.R. 421, 426 (1965). And in *United States v. Guerette, supra,* Judge Cook observed that a commander is not neutral or detached if he becomes "personally involved as an active participant in gathering evidence against accused." *Id.* 23 U.S.C.M.A. at 283, 49 C.M.R. at 532.

 It is thus clear that the Fourth Amendment applies with equal force within the military[23] as it does in the civilian community.[24] It is likewise clear that in the military, as in the civilian, communities, the official empowered by law to issue search warrants under the Fourth Amendment must be neutral and detached and must perform his duties with "a 'judicial' rather than a 'police' attitude."[25] Thus, no person purporting to act contemporaneously as judge, magistrate or any other official exercising the warrant authority on the one hand, and as policeman or prosecutor on the other hand, may escape the strictures of the Fourth Amendment.[26]

## II

In these cases, the appellants contend that, for a variety of reasons, military commanders are inherently devoid of neutrality and detachedness.[27] We are, therefore, urged to announce a *per se* rule of disqualification of the commander as an appropriate official to exercise the warrant authority of the Fourth Amendment. We proceed here to discuss that contention together with the various arguments of the parties.

 First, the appellants argue that since military commanders are subordinate to the President because Article II of the Constitution designates him the Commander in Chief of the Armed Services, they are members of the Executive branch. Therefore, it is contended, they are disqualified to serve as neutral and detached magistrates since "[t]he Fourth Amendment does not contemplate the executive officers of Government as neutral and disinterested magistrates." *United States v. United States District Court, supra* 407 U.S. at 316–17, 92 S.Ct. at 2137. This contention, we believe, misconstrues the full reach of the powers conferred by Article II upon the President of the United States. It is true that Section 1 of Article II of the Constitution provides that "[t]he executive Power shall be vested in a President of the United States of America." And, while the full panoply of that power is not delineated, it is clear that it is the persons exercising that executive power which the Court referred to when it declared that "[t]he Fourth Amendment does not contemplate the executive officers of Government as neutral and disinterested magistrates." *Id.* But Section 2 of Article II contains additional presidential powers, many of which may fall outside the scope of functions ordinarily perceived as "executive."[28] Thus, the President is specifically designated the "Commander in Chief of the Army and Navy of the United States, and of the Militia of the

---

23. *But see* text at note 19, *ante.*

24. *See* text at notes 15–19, *ante.*

25. *See* text following note 21, *ante.*

26. *See* text at notes 3–22, *ante.*

27. The appellant's remaining contentions that the military commanders in these cases were individually disqualified to authorize the searches by reason of their active involvement in the investigations are discussed in reference to each case in Part III of this opinion.

28. For a discussion of those functions generally described as "executive," *see* 16 C.J.S. Constitutional Law § 167:

Under our system of government it is universally agreed that it is the function of the executive department, honestly and efficiently, to administer and enforce the laws as written and as interpreted by the courts. *See also United States v. Nixon,* 418 U.S. 683, 94 S.Ct. 3090, 41 L.Ed.2d 1039 (1974).

several States, when called into the actual Service of the United States." While Section 1 of Article II reposes the executive power in the President, we do not perceive his title of "Commander in Chief" of the Armed Services to be a component of the executive power. The role of the President as the Commander in Chief of the Armed Services is a power in addition to the executive power conferred in Section 1 of Article II and does not envision the performance of those law-enforcement and prosecutorial functions which have been held to deprive the executive officers of Government of that neutrality and detachedness which the Fourth Amendment requires. The fact that military commanders are subordinate to the President in his role as the Commander in Chief of the Armed Services in no way involves them in the President's operational and managerial functions as chief executive of the Government of the United States.[29] We observe that Article II also confers upon the President the authority to appoint, by and with the advice and consent of the Senate, judges of the Supreme Court and all other officers of the United States whose appointments are not otherwise provided for and which shall be established by law. Included among those powers is the power to appoint judges of all the federal courts of the United States. No court has held that this presidential appointive power infects the judiciary with the executive power. Thus, we reject the contention that military commanders should be declared *per se* disqualified because they are subordinate to the President of the United States as Commander in Chief of the Armed Services.

■ It is next contended that paragraph 152, supra, which confers upon military commanders the power to authorize searches, does not constitute a rule pre-

scribing the modes of practice before courts-martial. Therefore, it does not constitute an exercise of the authority which Congress conferred upon the President of the United States in Article 36, Uniform Code of Military Justice, 10 U.S.C. § 836, which provides:

(a) The procedure, including modes of proof, in cases before courts-martial, courts of inquiry, military commissions, and other military tribunals may be prescribed by the President by regulations which shall, so far as he considers practicable, apply the principles of law and the rules of evidence generally recognized in the trial of criminal cases in the United States district courts, but which may not be contrary to or inconsistent with this chapter.

Thus, it is argued, to the extent that military commanders rely upon paragraph 152 of the Manual as their authority to authorize searches, the authority is nonexistent because paragraph 152 exceeds the scope of the President's powers under Article 36 of the Code. This argument, we believe, fails to consider the fact that, as Commander in Chief of the Armed Services under Article II of the Constitution, the President has powers not otherwise conferred upon him by Article 36, UCMJ, to deploy troops and assign duties as he deems necessary. *Kurtz v. Moffitt*, 115 U.S. 487, 6 S.Ct. 148, 29 L.Ed. 458 (1885); *United States v. Freeman*, 3 How. 556, 11 L.Ed. 724 (1845).[30] While under Article I of the Constitution, the Congress has the ultimate authority "[t]o make Rules for the Government and Regulation of the land and naval Forces," it has not specifically provided for the designation of a judicial authority within the military to fulfill the warrant requirements of the Fourth Amendment. Therefore, the

---

**29.** *Id. Compare* Fratcher, *Presidential Power to Regulate Military Justice: A Critical Study of Decisions of the Court of Military Appeals,* 34 N.Y.U.L.Rev. 861 (1959), *with* Neff, *Presidential Power to Regulate Military Justice,* 30 Judge Advocate Journal 6 (1960).

**30.** The Manual provision here is at least on the sound basis which the Supreme Court accorded

Army Regulations in *Kurtz v. Moffitt*, 115 U.S. 487, 503, 6 S.Ct. 148, 154, 29 L.Ed. 458 (1885):

[T]he army regulations, promulgated by the secretary of war under authority of the president, . . . derive their force from the power of the president as commander in chief.

President has sought to fill that void by the promulgation of paragraph 152 of the Manual for Courts-Martial.

The Court has had the occasion to comment upon presidential regulations which exceed the perimeters of Article 36, UCMJ, and has held them to be advisory in nature. *United States v. Smith,* 13 U.S.C.M.A. 105, 32 C.M.R. 105 (1962); *United States v. Jenkins,* 7 U.S.C.M.A. 261, 22 C.M.R. 51 (1956); *United States v. Hooper,* 5 U.S.C.M.A. 391, 18 C.M.R. 15 (1955). One commentator has suggested that within the category of "procedure," the statute (Article 36) places "modes of proof" and that within the ambit of Article 36(a) are both "principles of law" and "rules of evidence that constitute procedure." Fidell, *Judicial Review of Presidential Rulemaking under Article 36: The Sleeping Giant Stirs,* 4 Mil.L.Rep. 6049 (1976). The recurring nature of the debate is seen in the variety of views which have occasionally been expressed by commentators. *See* Everett, *Some Comments on the Role of Discretion in Military Justice,* 37 Law and Contemp.Prob. 173, 177 (1972); Quinn, *Court-Martial Practice: A View from the Top,* 22 Hastings L.J. 201, 206 (1971). This Court also has had the occasion to discuss the subject. *See United States v. Newcomb,* 5 M.J. 4 (C.M.A.1978) (Cook, J., concurring); (Fletcher, C. J., dissenting); *United States v. Worley,* 19 U.S. C.M.A. 444, 42 C.M.R. 46 (1970); *United States v. Jenkins, supra.*

■ While there may be reasons to doubt that paragraph 152 of the Manual for Courts-Martial represents a proper exercise of the President's Article 36 powers, we shall consider the lawfulness of paragraph 152 as an exercise of the powers conferred upon the President by Article II of the Constitution of the United States as Com-

mander in Chief of the Armed Forces. Accordingly, we reject the contention that military commanders have no lawful authority to perform the warrant function of the Fourth Amendment.

Finally, the appellants contend that commanding officers are so involved in the business of investigating criminal conduct that they are devoid of neutrality and detachedness. The very objective of command, it is argued, is the maintenance of law, order, and discipline. Therefore, to effectuate that command objective, it is said that the commander necessarily becomes a law-enforcement official. The appellants remind us that commanding officers have the authority to arrest. Article 7(b), UCMJ, 10 U.S.C. § 807(b); paragraph 19a, Manual, *supra.* We are also reminded that this Court has had occasion to pass upon conduct of the commander which underscores the law enforcement function of command. *United States v. Seay,* 1 M.J. 201 (C.M.A.1975) (commander questioning a suspect); *United States v. Hall,* 1 M.J. 162 (C.M.A.1975) (commander questioning an accused). *See also United States v. Holmes,* 43 C.M.R. 430 (A.C.M.R.1970), *pet. denied* 43 C.M.R. 413 (1971) (commander conducting a lineup). Indeed, it is clear that military commanders have statutory and Manual authority to perform many functions that are properly classified as law enforcement in nature. Yet, under paragraph 152 of the Manual for Courts-Martial, commanders are charged with the duty to authorize searches.

■ The military commander must himself or through subordinates perform a variety of duties. These include the concomitant authority to enforce the law,[31] authorize prosecutions for offenses allegedly committed,[32] maintain discipline,[33] investigate

---

31. *See United States v. Seay,* 1 M.J. 201 (C.M. A.1975).

32. Article 30(b), Uniform Code of Military Justice, 10 U.S.C. § 830(b).

33. *See* for example *Parker v. Levy,* 417 U.S. 733, 744, 94 S.Ct. 2547, 2556, 41 L.Ed. 439 (1974), which reemphasized prior recognition of the principle that " '[t]he military constitutes

a specialized community governed by a separate discipline from that of the civilian,' . . . and that 'the rights of men in the armed forces must perforce be conditioned to meet certain overriding demands of discipline and duty . . .' *Burns v. Wilson,* 346 U.S. 137, 140, 73 S.Ct. 1045, 97 L.Ed. 1508 (1953)." The Court also reiterated "that a military officer holds a par-

crime,[34] authorize searches and seizures,[35] as well as train and fashion those under his command into a cohesive fighting unit.[36] These duties provide the basis for a persuasive argument against the notion that he may at the same time be neutral and detached as contemplated by the Fourth Amendment. Indeed, no official in the civilian community having similarly combined functions could qualify as a neutral and detached magistrate under Fourth Amendment jurisprudence. *Shadwick v. Tampa*; *United States v. United States District Court*; *Coolidge v. New Hampshire*, all *supra*. We decline, however, to hold that military commanders are *per se* disqualified to act as neutral and detached magistrates. Our declination results not only for the reasons previously stated, *see United States v. Staggs, supra*,[37] but in deference to the President's designation of the commander as the authorized person to issue the search authorization.[38] Our deference to paragraph 152 of the Manual is, we believe, not

ill-founded, for Congress has conferred powers upon some military commanders which are judicial or quasi-judicial in nature.[39] And this Court has from time to time interpreted functions of the commander as judicial,[40] preferring to review the exercise of those judicial powers against established principles of law which pertain to the exercise of judicial functions [41] with respect to the exercise of his paragraph 152 powers.[42] We have recognized that the military commander is capable of neutrality when he is not actively involved in the investigative or prosecutorial functions which are otherwise clearly within the perimeters of command authority. *United States v. Staggs, supra*. We have also held that, when the military commander becomes personally involved as an active participant in the gathering of evidence or otherwise demonstrates personal bias or involvement in the investigative or prosecutorial process against the accused, that com-

---

ticular position of responsibility and command in the Armed Forces."

**34.** *United States v. Seay, supra*; *United States v. Hall*, 1 M.J. 162 (C.M.A.1975); *United States v. Holmes*, 43 C.M.R. 430 (ACMR 1970), *pet. denied* 43 C.M.R. 413 (1971).

**35.** Paragraph 152, Manual, *supra*.

**36.** *Parker v. Levy, supra*.

**37.** In *United States v. Staggs*, 23 U.S.C.M.A. 111, 113, 48 C.M.R. 672, 674 (1974), this Court observed:

Whether an authorization to search is made by a commanding officer, or . . . by his delegate, the act of authorizing a search on the basis of probable cause is a 'judicial function.' *United States v. Drew*, 15 U.S.C.M.A. 449, 454, 35 C.M.R. 421, 425 (1965). "[S]earches conducted outside the judicial process, without prior approval by judge or magistrate, are *per se* unreasonable under the Fourth Amendment—subject only to a few specifically established and well-delineated exceptions." *Katz v. United States*, 389 U.S. 347, 357 [88 S.Ct. 507, 19 L.Ed.2d 576] (1967) (footnotes omitted). One well-recognized exception to the requirement that a magistrate or judicial officer must authorize certain searches is found in the military practice permitting commanding officers or their delegates to authorize searches upon probable cause. Paragraph 152, MCM. Nevertheless, we have held that a command-

ing officer "stands in the same position as a Federal magistrate issuing a search warrant." *United States v. Sam*, 22 U.S.C.M.A. 124, 127, 46 C.M.R. 124, 127 (1973). Consequently, the military officer's decision to authorize a search on probable cause must be made with "a magistrate's neutrality and detachment." *Id*. Or, to put it in the words of the Manual in describing the necessary quality of an officer delegated the power to authorize searches, the magistrate function in the military must be exercised by an "impartial person." Paragraph 152, MCM. The search authority must be exercised with "a 'judicial' rather than a 'police' attitude to the examination of the operative facts." *United States v. Drew, supra* at 454, 35 C.M.R. at 426.

**38.** Paragraph 152, Manual, *supra*.

**39.** *United States v. Brownd*, 6 M.J. 338 (C.M.A.1979).

**40.** *United States v. Brownd, supra*; *United States v. Grosskreutz*, 5 M.J. 344 (C.M.A.1978); *United States v. Roberts*, 2 M.J. 31 (C.M.A1976); *United States v. Thomas*, 1 M.J. 397 (C.M.A.1976); *United States v. Guerette*, 23 U.S.C.M.A. 281, 49 C.M.R. 530 (1975); *United States v. Staggs, supra*.

**41.** *Id*.

**42.** Manual, *supra*.

mander is devoid of neutrality and cannot validly perform the functions envisioned by paragraph 152 of the Manual for Courts-Martial.[43] These approaches, properly applied, will, we believe, continue to provide for the men and women of the armed services the protection of the Fourth Amendment.

■ In light of what has been stated, we hold that obtaining information to be used as the basis for requesting authorization to search is a law-enforcement function and involvement in that information-gathering process would disqualify the commander from authorizing the search. Specifically included in this process are such actions as approving or directing the use of informants, the use of drug detection dogs except in gate searches,[44] the use of controlled buys, surveillance operations and similar activities. It is noted that there is no constitutional requirement for judicial approval of any of these activities before they may be conducted.

■ Once the law enforcement agency decides that there is a sufficient basis for requesting search authorization, then the information available to them may be presented to the commander for his judicial determination. At this point the commander may require the agency to provide such additional information as he deems necessary. This would be an exercise of his judicial function since he is passing upon the sufficiency of a completed application. It must be emphasized that agencies must not use the request to search as a subterfuge by presenting a clearly deficient request so that the commander may help fill in the gaps. Finally, we consider that anyone present during the search is engaged in law-enforcement activities, so we expect that the commander will not be present at the scene of the search. Presence would indicate to us that the commander has been engaged in law-enforcement activities throughout his participation in the entire authorization process, except in very extra-ordinary situations, which we will deal with on a case-by-case basis.

## III

We proceed now to consider the pertinent facts of each case, together with the context in which the crucial issues arose.

### A. *United States v. Ezell, # 31,304*

On June 21, 1974, at about 10:20 a. m., Captain Morris and Special Agent West of the Criminal Investigation Division (CID) approached Lieutenant Colonel Cross, the commander of the 326th Engineer Battalion at Fort Campbell, Kentucky, and sought permission to search the barracks rooms occupied by Pvt. E–2 Elijah Ezell, Jr., an enlisted member assigned to the 326th Engineer Battalion. They advised Colonel Cross that an informant had made a sworn statement that he (the informant) had purchased a quantity of heroin from Ezell that morning in Ezell's barracks room and had observed additional heroin and a pistol in the room. They also advised Colonel Cross that they had the heroin in their possession and that the informant was willing to testify that the sale had occurred. They further stated that they (the CID) had formulated a plan by which the informant was to make a second purchase of heroin from Ezell later that day. Colonel Cross thereupon authorized a search of Ezell's barracks room. Pursuant to that authorization, CID agents subsequently conducted the search of Ezell's barracks room and seized a quantity of heroin and a pistol. Ezell was arrested and charged with two specifications of distributing heroin to the CID informant prior to the search; possession of heroin with intent to distribute (Charge I, specification 3); possession of drug paraphernalia; and the failure to deposit a nongovernment owned firearm for safekeeping (Charge III, specification 2), in violation of Articles 134 and 92, UCMJ, 10 U.S.C. §§ 934 and 892, respectively.

---

43. *United States v. Guerette, supra; United States v. Staggs, supra.*

44. *United States v. Grosskreutz, supra; United States v. Harris*, 5 M.J. 44 (C.M.A.1978).

During his trial, Ezell challenged the seizure of the heroin and the pistol by the agents during the search of his room on Fourth Amendment grounds. He contended there and here that (1) Colonel Cross was biased against him as evidenced by the fact that one month prior to the search authorization Colonel Cross had ordered that Ezell be administratively discharged as unsuitable for military service; and (2) that military commanders are inherently devoid of neutrality. During the hearing on the challenge, Colonel Cross testified concerning what he knew about Ezell and how he made the finding of probable cause on which the search authorization was made.[45] He denied that he was "after Ezell" but admitted that he would prefer to see Ezell out of his unit.[46] Because of the "pattern" of Ezell's minor transgressions and "illegal activities," Colonel Cross had, he admitted, "signed off" on the Chapter 13 (administrative) discharge. The military judge rejected the challenge and, resultantly, Ezell was convicted of offenses involved in this review.[47] He was sentenced to dishonorable discharge, confinement for 25 years, total forfeitures, and reduction to the lowest enlisted grade. The United States Army Court of Military Review reduced the confinement to 9 years, but in all other respects, affirmed the findings and the sentence.[48]

 We conclude that while Colonel Cross was aware of Ezell's presence in the unit and of allegations that he had been involved in some "illegal activities," there is no showing that Colonel Cross was personally biased against Ezell or that he involved himself in the investigative or prosecutorial function. While performing the traditional command function of maintaining his troops in a state of readiness to perform any mission required of them, Colonel Cross remained severed and disengaged from activities of law enforcement and prosecution. We reject the contention that because Colonel Cross had been informed that Ezell had been involved in some illegal activities and that he would prefer not to have Ezell in his unit, he was biased. Colonel Cross was, therefore, not disqualified to issue the authorization to search Ezell's barracks room. Thus, there was no error in admitting the heroin and the pistol seized in the search.

### B. *United States v. Boswell, # 32,414*

On December 3, 1974, Major Moi, Company Commander of Headquarters Company, First Support Brigade, Headquarters Commandant and the Assistant Installation Co-

---

**45.** Colonel Cross testified during proceedings on the challenge to the search: "Well, the accused had been on the periphery. His name had come up a number of times during the year or the period I had been in command. We never had any hard evidence that he was involved in drug traffic before that we were able to prosecute or anything. . . . Based on the character of the individual and his associations, I felt that it was probably so that he was selling heroin."

**46.** Colonel Cross' tacit admission that he would prefer to see Ezell out of his unit and his personal approval of an administrative discharge undoubtedly constituted evidence that Colonel Cross regarded Ezell as a disciplinary problem and, indeed, that Ezell was unsuitable for further military service. On the other hand, there is no showing that Colonel Cross was involved in the investigative process (see note 10), or that he personally dispatched the informant to Ezell's room or that he was otherwise involved in the business of ferreting out evidence of crime. His role in this case was well within the recognized function of command.

**47.** Ezell was convicted of all charges. However, this appeal involves only the possession of heroin and the possession of nongovernment-owned firearms. In addition to the question we have discussed in the text concerning Colonel Cross' qualifications to authorize the search, we granted review to consider whether the trial judge erred in denying a motion to return the charges to the convening authority to amend the Charge Sheet to indicate that the offenses were alleged as a violation of Article 92 instead of Article 134. *See United States v. Courtney,* 1 M.J. 438, 443 (C.M.A.1976). That issue has been resolved against the appellant by our opinion in *United States v. Jackson,* 3 M.J. 101 (C.M.A.1977).

**48.** The Court of Military Review held that the military judge erred when he failed to instruct the panel concerning the limited purpose for which certain acts of uncharged misconduct had been mentioned during the trial and, accordingly, reassessed the sentence.

ordinator of Panzer Kaserne, was told by an informant[49] that Private Phil Boswell, a member of the command, was, later that day, going to sell a quantity of marihuana to two other enlisted men then working as gate guards. The informant stated that he had overheard Boswell and the gate guards discussing the anticipated sale and that the transfer sale would occur somewhere in the barracks and that the informant believed that a search of the gate guards' room would lead to the discovery of marihuana. The informant also stated that he, on several occasions, had been in Boswell's room and that he had observed quantities of marihuana while there. He further stated that on the previous day (December 2, 1974) he was in Boswell's room and had observed marihuana in the "right hand drawer" of the desk therein.[50] Major Moi thereupon authorized searches of the gate guards' rooms and of Boswell's room. Major Moi personally conducted the search of Boswell's room in the presence of Boswell and another enlisted man. He proceeded to examine the desk where the informant had said the marihuana was seen the previous day. Nothing pertinent here was found in the drawer. Major Moi then looked under some coats on a sofa and discovered a packet containing mandrax tablets. A piece of paper was found on the floor which contained a small amount of what appeared to be hashish. He proceeded to examine a cupboard in which he found a coffee can which contained hashish and mandrax tablets.

**49.** Major Moi's testimony reveals that he knew the informant and had received information from the informant during the period of "at least four, five months" which involved several investigations.

**50.** At the time of this search, Boswell resided in the room alone.

**51.** Boswell's challenge was based upon the contention that the information given Major Moi was insufficient to support a finding of probable cause. That claim was not renewed here. Instead, Boswell rests his case before us on the contention that Major Moi was not a neutral and detached magistrate. The evidence presented to the military judge fully sustains the conclusions we reach.

At his trial on charges that he possessed marihuana and methaqualone, in violation of Article 92 and 134, *supra*, Boswell challenged use of the evidence seized by Major Moi during the search of the room.[51] While testifying on the challenge, Major Moi stated that prior to the search of Boswell's room, he had received information from several sources that Boswell was dealing in narcotics; and that he had administered nonjudicial punishment to Boswell about 3 months prior to this incident on account of the possession of marihuana. He further testified that about 2 weeks prior to this search, he had entered Boswell's room and caught Boswell and others in the midst of a "pot party." However, he stated, he "blew that one" since he should have searched the room at that time. Finally, Major Moi stated that there was "no doubt in my mind at all" that marihuana would be found in Boswell's room. The military judge rejected the challenge and, resultantly, Boswell was convicted as charged by special court-martial. He was sentenced to a bad-conduct discharge, forfeiture of $200 pay per month for 2 months, and confinement at hard labor for 2 months. The sentence was approved by the convening authority. The Court of Military Review found the charges multiplicious for sentencing purposes, and after reassessing the sentence based on this error, affirmed the same sentence.

We conclude that under the circumstances of this case, Major Moi was not neutral and detached but that, instead, he was involved in the "often competitive en-

We are aware that in *Boswell*, No. 32,414, and *Sanchez*, No. 33,326, there was no objection at trial to the qualifications of the commander to authorize the search. However, we consider the disqualification of the commander in each of these cases to be plain error, and we can notice plain error even though the issue was not raised at trial. *United States v. Brown*, 555 F.2d 407, 420–21 (5th Cir. 1977); see *United States v. Seidlitz*, 589 F.2d 152, 160 (4th Cir. 1978); *United States v. Johnson*, 585 F.2d 119, 127 (5th Cir. 1978); *United States v. Greene*, 578 F.2d 648, 654 (5th cir. 1978). *See also United States v. Hendrix*, 21 U.S.C.M.A. 412, 45 C.M.R. 186 (1972).

terprise of ferreting out [evidence of] crime." *United States v. Johnson, supra.*[52] By personally conducting [53] the search and seizing the items whose admission was challenged, Major Moi revealed that he had been engaged in law enforcement activities throughout his participation in the entire authorization process. In addition his attitude resulting from the failure of the earlier search of the accused's room to support action against the accused raised the spectre of bias which must be avoided if the authorizing official is to remain neutral and detached. Accordingly, the commander was disqualified from authorizing the search since he was not neutral and detached, and the products of the search were inadmissible in evidence.

### C. *United States v. Sanchez, # 33,326*

The appellant, Private E–1 Edward V. Sanchez, was a clerk in the office of Casual Company, Marine Corps Recruit Depot, San Diego, California. Casual Company was a unit composed mainly of transient personnel who were either awaiting assignment to the drug rehabilitation center or were returning after completion of the drug treatment program to await reassignment to regular duty or separation from the service. The unit also contained Marines who were presently receiving treatment at the Naval Drug Rehabilitation Center. Because of its very composition, Casual Company experienced a high rate of narcotic usage within the area it occupied.

Concerned with the health and safety of the personnel within the unit, Major Dube, company commander of Casual Company, instituted an all-out effort to purge the company of narcotics. In furtherance of that effort, Major Dube authorized and personally participated in thorough "sweeps" of the barracks occupied by the unit with marihuana detection dogs. On March 20, 1975, Major Dube, together with a group of military policemen conducted a general walk through the barracks of Casual Company. They were looking for narcotics. To aid them in that effort, they utilized a marihuana detection dog named Thunder. The appellant, Sanchez, serving as the search team's clerk and runner, also accompanied the group.[54] When the group walked into the area of Sanchez's locker, Thunder "alerted." Thereupon, one of the agents advised Sanchez of his rights. At the same time, Major Dube signed a search warrant and gave it to Sergeant Harris, the military policeman who was, at the time, confronting Sanchez with the fact that Thunder had "alerted" at Sanchez' locker. Sergeant Harris thereupon apprised Sanchez that he (Harris) now had a search authorization from Major Dube to enter and search the wall locker. Sanchez thereupon opened the locker. During the search of the locker, the military police discovered and seized quantities of marihuana and heroin. Sanchez was charged with possession of marihuana and heroin in violation of Article 92, supra.

At his trial, Sanchez unsuccessfully objected on Fourth Amendment grounds to all the evidence seized during the search of

---

**52.** *See* text at notes 7–14.

**53.** See text at note 10. In his separate opinion Judge Cook cites *United States v. Duncan*, 420 F.2d 328 (5th Cir. 1970), for the proposition that a judge is not constitutionally prohibited from attending a search conducted under a warrant he has properly issued. *Duncan* is not applicable here. Since the decision in *Duncan*, the United States Supreme Court has removed any doubt which might have previously existed by clearly stating the requirement of neutrality and detachment as requiring "severance and disengagement from *activities* of law enforcement." *Shadwick v. Tampa*, 407 U.S. 345, 350, 92 S.Ct. 2119, 2123, 32 L.Ed.2d 783 (1972).

**54.** Major Dube testified that, procedurally, Thunder and his handler would walk through the barracks accompanied by Major Dube, the CID agents and Sanchez. When Thunder "alerted" at a particular locker or other area, Sanchez would go to the area where the Marines who lived in the barracks had previously been assembled, notify the person concerned, and escort him back to the locker or area where the dog had "alerted." During the interim, Major Dube would fill out a written search warrant, based upon Thunder's "alert" and then the locker would be opened and searched. Further, only those lockers as to which Thunder had alerted were subjected to a search.

the locker. He was convicted as charged and sentenced to a bad-conduct discharge, imprisonment for 2 months, and forfeiture of $225 pay per month for 2 months. The United States Navy Court of Military Review has affirmed the findings and the sentence. We agree with the conclusions of the Court of Military Review in the resolution of the issues presented to that court. However, we conclude that under the circumstances shown by the record, Major Dube was actively involved in the police investigative function. He not only initiated the search procedure but selected the times and the scope of the searches and personally participated. He was not severed and disengaged from the activities of law enforcement and was, therefore, not neutral and detached.[55] Therefore, it was error to admit evidence discovered and seized on the basis of a search authorized by him.

Our determination that the commander was disqualified requires us to consider whether Sanchez consented to the search. The evidence reveals that, while a member of the search party, Sanchez was in the same vicinity of the barracks as was the commander when the dog alerted on his locker. Shortly before this time, the commander had given authority to search another locker after the dog alerted. After admitting it was his locker, Sanchez was warned of his rights, including his right not to consent. (Sanchez denied this.) Then the CID agent told him that the dog had alerted on his locker and asked if he objected to a search. Sanchez replied he had nothing to hide. Then he hesitated briefly and opened the locker. According to the commander, he signed the search authorization before anything was done after the alert. He said he signed the authorization while Sanchez was being advised of his rights. In fact, the commander testified that "as I was signing it . . . I made a comment to Sanchez that I hoped the dogs were wrong." At this time Sanchez was only a few feet away. Furthermore, when the commander was asked to sign the authorization, this was in the accused's presence. Because of this evidence, it appears that there is insufficient basis for clearly and convincingly negating the view that when Sanchez purported to consent to the search, he was aware that the authorization had been signed by the commander. Thus, the following principle [56] from *Bumper v. North Carolina*, 391 U.S. 543, 550, 88 S.Ct. 1788, 1792, 20 L.Ed.2d 797 (1968), is controlling:

When a law enforcement officer claims authority to search a home under a warrant, he announces in effect that the occupant has no right to resist the search. The situation is instinct with coercion— albeit colorably lawful coercion. Where there is coercion there cannot be consent.

We believe this principle applies even where, as here, the accused is told he was not required to consent. We hold that the evidence is insufficient to negate [57] mere acquiescence by Sanchez to the search authorization and therefore consent cannot support the search.[58] In reaching this conclusion, we have considered the holding by the Fifth Circuit en banc (9–6) that consent to search occurred where the accused knew there was a warrant but told the officers that the warrant was not needed and they could search anyplace they wished.[59] We are satisfied that the difference in circumstances warrants the result we reach. *Cf. United States v. Jones*, 475 F.2d 723 (5th

55. *See* text at note 10.

56. The lady who gave consent testified that she agreed to the search of "my own free will" since she felt her grandson had not done anything illegal. 391 U.S. 543, 547 n. 8, 88 S.Ct. 1788, 20 L.Ed.2d 797 (1968).

57. *See United States v. Collier*, 1 M.J. 358 (C.M.A.1976).

58. *See United States v. Mayton*, 1 M.J. 171 (C.M.A.1975); *United States v. Noreen*, 23 U.S. C.M.A. 212, 49 C.M.R. 1 (1974); *United States v. Vasquez*, 22 U.S.C.M.A. 492, 47 C.M.R. 793 (1973); *United States v. Watkins*, 22 U.S.C. M.A. 270, 46 C.M.R. 270 (1973).

59. *Hoover v. Beto*, 467 F.2d 516, 518–22, 539– 40, 545–47 (5th Cir. 1972) (en banc), *cert. denied sub nom. Hoover v. Estelle*, 409 U.S. 1086, 93 S.Ct. 703, 34 L.Ed.2d 673 (1972).

Cir. 1973). We are also aware of the view that advising the accused that if he did not consent, the officers could get a warrant, did not amount to coercion. *United States v. Faruolo*, 506 F.2d 490 (2d Cir. 1974). But there is a substantial difference between what could be done and what the accused knew had already been done. Finally, we observe that the appellant's testimony that he never saw the authorization; that he felt he had to open his locker because "I was just following orders" after "they asked me to"; and that "I opened it because I didn't have nothing to hide" does not change the result we reach. Since the search was illegal, reversal is required. Without the evidence obtained in the search, there is no basis for prosecution.

D. *United States v. Brown, # 33,679*

■ On or about February 27, 1975 the commander of Bitburg Air Base, Colonel Wehling, approved a proposal by agents of the Office of Special Investigations (OSI) concerning their use of an informant named Fox, pursuant to which Fox observed and reported to OSI agents the use, possession, transfers and sale of narcotics by persons on Bitburg Air Base. Under the plan, Fox would make "controlled" purchases from persons engaged in the sales of narcotics and report that fact to OSI agents, surrendering to them the narcotics he had purchased. The purpose of Fox's use by the OSI was to gather evidence for presentation, through Fox's testimony, at or during prosecution of those persons later charged with the possession or sale of narcotics. Fox was often equipped with electronic listening devices, which Colonel Wehling also approved. Colonel Wehling was given all information conveyed to the OSI by Fox, whose activities continued during several months prior to the incident involved in the instant case, and he collaborated with his staff judge advocate from time to time, receiving advice concerning Fox's use. In some cases, Colonel Wehling was present when Fox gave his information and gave him directions concerning his further activities.

The record further shows that the commander purported to grant immunity to the informant, conditioned upon his cooperation with the OSI in making controlled purchases of prohibited drugs and testifying at courts-martial concerning such purchases, although the commander knew this act exceeded his authority. Paragraph 68*h*, Manual, *supra*. It appears that his action granting immunity was taken after consultation with USAFE JAG personnel.[60]

On April 17, 1975, Fox informed OSI agents that he had witnessed the sale and transfer of a quantity of heroin by the appellant Brown to three other servicemen. The sale, Fox reported, had occurred in Brown's barracks room and Brown had removed the heroin which he sold from his locker. Upon receipt of information concerning this sale, Colonel Wehling authorized the OSI agents to conduct a search of Brown's room for narcotics. During the search conducted the following day, the agents discovered and seized quantities of heroin and marihuana. Brown was arrested and charged with 3 specifications concerning the sale of heroin, 2 specifications of possession of heroin, and 2 specifications of possession of marihuana, in violation of Article 134, *supra*. The military judge denied Brown's challenge against the evidence seized during the search of his room. He was sentenced to a dishonorable discharge, confinement for 5 years, total forfeitures and reduction to the lowest enlisted grade. The convening authority reduced the period of confinement to 3 years, but otherwise approved the sentence. The United States Air Force Court of Military Review reversed the finding of guilty as to one of the specifications and reduced the confinement to 30 months. In all other respects the conviction was affirmed. 2 M.J. 713 (A.F.C. M.R.1976).

■ Because of his personal involvement in the investigative activities of the OSI agents and their informant, to the ex-

---

**60.** We find this action to be an abuse of authority which *per se* disqualified the commander from authorizing this search. Such action is a subterfuge and, therefore, is to be condemned.

tent of approving use of an informant to gather information, to make "controlled" purchases of narcotics and to report that fact to law-enforcement agents; as well as giving approval to equipping the informant with electronic listening devices, Colonel Wehling was not severed and disengaged from law-enforcement activities. Therefore, with respect to specifications 6 and 7,[61] we hold that when he authorized the search of Brown's room, he was not a neutral and detached magistrate. It necessarily follows that the evidence seized during the search of Brown's barracks room should have been excluded by the military judge.

## IV

■ Our decision rejecting the contention that the military commander is *per se* disqualified to serve as a neutral and detached magistrate for purposes of the Fourth Amendment recognizes that the commander has the ultimate responsibility for the welfare and safety of those under his command, together with the ultimate success of the objective(s) assigned to him. The national interests of the United States depend upon prompt and efficient obedience to the directions of command. Both the President and the Congress have conferred upon a commander the requisite authority to carry out his mission. Neither this Court nor, to our knowledge, any other, has ever interfered with the performance by the military commander of those functions that are clearly military. However, the title "military commander" is not a talisman in whose presence the Fourth Amendment to the Constitution of the United States vanishes or contains different meaning. There is but one Fourth Amendment. We have held that, where the justifiable expectation of privacy exists, men and women within the armed services of the United States are entitled to its protection. *United States v. Grosskreutz*; *United States v. Roberts*; *United States v. Thomas*; *United States v. Kinane*, all *supra*. To the extent that the commander chooses to exercise the authority under paragraph 152 of the Manual for Courts-Martial by authorizing searches—a judicial function, the performance of which we must measure against Fourth Amendment standards—he must indeed be neutral and detached concerning the case in which he purports to act. Thus he may not, with respect to that case, authorize searches and seizures of persons or things while at the same time performing investigative or prosecutorial functions.[62]

The decision of the United States Army Court of Military Review in No. 31,304, *United States v. Ezell*, is affirmed.

The decision of the United States Army Court of Military Review in No. 32,414, *United States v. Boswell*, is reversed. The record of trial is returned to the Judge Advocate General of the Army. A rehearing may be held.

The decision of the United States Navy Court of Military Review in No. 33,326, *United States v. Sanchez*, is reversed. The

61. *See* text at note 10. Brown was convicted of 5 offenses. In his brief he conceded that the questions he has raised concerning the search are limited to specifications 6 and 7 of the Charge.

62. Three of the services have described procedures for officials empowered to issue search authorizations:

The Army has established a system of military judges and has established guidelines regarding the issuance of search warrants by those judges. *See* AR 27–10, Chapter 14 (1973).

The Air Force has described procedures to be followed by commanders in authorizing searches and seizures in paragraph 1–8, AFM 111–1 (1973), and has expressed the preference that "[a]uthority to conduct a search . . . be in writing unless the exigencies of the situation make it impracticable."

The Coast Guard has delineated a procedure for issuance of search warrants in that service by military judges. *See* Military Justice Manual, CG–488, Chapter IX, which provides, *inter alia*: "The Chapter provides guidance, and is not to be viewed as inflexible. . . . This Chapter does not derogate in any manner from the authority of the commanding officer or his delegee to order a search on probable cause. The Chapter is intended to offer another alternative to the commanding officer, an alternative which should reduce the risk that a search may later be found to be unlawful." Para. 900–1(a).

record of trial is returned to the Judge Advocate General of the Navy. A rehearing may be held.

The decision of the United States Air Force Court of Military Review in No. 33,-679, *United States v. Brown*, is reversed. The findings of guilty as to specifications 6 and 7 of the Charge and the sentence are set aside. The remaining findings of guilty are affirmed. The record of trial is returned to the Judge Advocate General of the Air Force for referral to the Court of Military Review. That Court may dismiss specifications 6 and 7 and reassess the sentence based on the approved findings of guilty, or it may order a rehearing.

FLETCHER, Chief Judge (concurring):

I

I concur. Judge Perry's opinion constitutes a well-reasoned and articulate enunciation of the civilian law of search and seizure as interpreted at the present time and as generally applied in courts-martial. Yet, the implication of that opinion, namely, that a servicemember is entitled under the Fourth Amendment to a probable cause determination by a "neutral and detached magistrate" as in the civilian community, becomes increasingly suspect to me. As indicated in my recent opinions in *United States v. Harris*, 5 M.J. 44 (C.M.A.1978); *United States v. Rivera*, 4 M.J. 215 (C.M.A. 1978); *United States v. Thomas*, 1 M.J. 397 (C.M.A.1976), a reconsideration of this traditional mode of comparative analysis for the military law of search and seizure and its relationship to the Fourth Amendment is imminent. It is essential for this Court to keep pace with the constitutional evolution of the military justice system fashioned by the Supreme Court and the emerging realities of life in the modern military community.

II

The fundamental question before this Court and common to the several appellants is the degree of constitutional protection against unreasonable search and seizure available to a citizen on active duty in the military. The specific constitutional question before this Court is whether a service member is entitled under the Fourth Amendment to the impartial decision of a neutral and detached magistrate prior to a constitutional search of his person and property within the military community.[1] This issue is raised in the particular context of the propriety of the authorization of a commanding officer to order searches and seizures of the person and property within his military control.[2] The appellants contend that a military commander *per se* fails to meet the standards of impartiality required by the Fourth Amendment for neutral and detached magistrates in a civilian community and, consequently, the military procedure denies to the servicemember a fundamental right under the Constitution.

The lead opinion agrees that such a magistrate is required but continues to assert that a military commander, unless actively involved in the prosecution case, will not be *de facto* or *de jure* disqualified from issuing a lawful warrant to search.

I believe the assertion of a constitutional right for a service person in the idiom of the civilian community is increasingly unsatisfactory and confusing. Moreover, the resolution of a Fourth Amendment question on the propriety of the search need not unnecessarily focus *ipso facto* on the existence of a neutral and detached magistrate in the sense defined for a civilian community. The absence of any statutory posture for the Fourth Amendment as an element of the military justice system and the atti-

1. Similar questions concerning a servicemember's rights under the Fifth and Sixth Amendments to the Constitution were treated by the Supreme Court in *Middendorf v. Henry*, 425 U.S. 25, 34 n. 12, 96 S.Ct. 1281, 47 L.Ed.2d 556 (1976). *See also* Henderson, *Courts-Martial and the Constitution: The Original Under-standing*, 71 Harv.L.Rev. 293, 315, 324 n. 172 (1957); Wiener, *Courts-Martial and the Bill of Rights: The Original Practice* II, 72 Harv.L.Rev. 266, 271 (1958).

2. Paragraph 152, Manual for Courts-Martial, United States, 1969 (Revised edition).

tude of the Supreme Court toward the applicability of constitutional protections embraced in the Bill of Rights for service persons lend support for a separate analysis of these issues focusing on the realities of life in the military.

The Constitution itself, except in case of indictment by a grand jury,[3] contains no express pronouncement on the applicability of the individual protections in the Bill of Rights to a member of the armed forces. *See also* U.S.Const. art. I § 8, and art. II § 2. However, by implication, the Supreme Court has read the Sixth Amendment right to trial by jury as also excluding members of the armed forces on active duty.[4]

The Highest Court of our country has not decided a case concerning the application of the Fourth Amendment to the military justice system nor has it expressly indicated its position on the available protection under this amendment to citizens in the military. Congress in its enactment of the Uniform Code of Military Justice and its subsequent amendments to it did not expressly provide for search and seizure in the military justice system nor in particular for a neutral and detached magistrate. 10 U.S.C. §§ 801–934. Nevertheless, the President, acting under the authority of Article II, § 2, of the United States Constitution as commander-in-chief, as contended by Judge Perry, or under Article I, § 8 of the Constitution and Article 36, UCMJ, 10 U.S.C. § 936, as purported in the government's briefs, has prescribed certain procedures, including the one at issue in the cases at bar, for search and seizure in the military.

I do not believe the absence of express constitutional pronouncements in the area of search and seizure for the military constitutes an abrogation of the rights of the citizen soldier so absolute as to preclude any review of the military search procedures for reasonableness of government action. Indeed, the Supreme Court has found the existence of limited constitutional rights for the service person even where that document remains silent.[5] I believe that the change in status from civilian to soldier does not automatically vitiate those constitutional rights inherent in any citizen which military necessity does not constitutionally justify denying to him. Moreover, military necessity cannot assume the proportions of a legitimate constitutional justification for intrusive government action unless the party asserting it as warranting a different rule than in the civilian community shows this military condition to exist and to necessitate such a reasonable response by the Government.[6]

As the Supreme Court has said:[7]

The military courts, like the state courts, have the same responsibilities as do the federal courts to protect a person from a violation of his constitutional rights.

Accordingly, in light of these considerations, I find it appropriate to test this Manual provision authorizing search and seizure in the military for compliance with the Fourth Amendment but expressly within the context of the necessary powers of the President as commander-in-chief and designee of the Congress as regulator of the armed services.

The Supreme Court has also said:[8]

---

3. U.S.Const. amend. V states:
 No person shall be held to answer for a capital, or otherwise infamous crime, unless on a presentment or indictment of a Grand Jury, except in cases arising in the land or naval forces, or in the Militia, when in actual service in time of War or public danger; . .

4. *O'Callahan v. Parker*, 395 U.S. 258, 261, 89 S.Ct. 1683, 23 L.Ed.2d 291 (1969). *See also Middendorf v. Henry, supra*, 424 U.S. at 53 n. 2, 96 S.Ct. 1281 (Marshall, J., dissenting).

5. . *See Middendorf v. Henry, supra; Schlesinger v. Councilman*, 420 U.S. 738, 95 S.Ct. 1300, 43

L.Ed.2d 591 (1975); *Parker v. Levy*, 417 U.S. 733, 94 S.Ct. 2547, 41 L.Ed.2d 439 (1974); *Burns v. Wilson*, 346 U.S. 137, 142, 73 S.Ct. 1045, 97 L.Ed. 1508 (1953).

6. *Courtney v. Williams*, 1 M.J. 267, 270 (C.M.A. 1976).

7. *Burns v. Wilson, supra*, 346 U.S. at 142, 73 S.Ct. at 1048.

8. *In Re Yamashita*, 327 U.S. 1, 16, 66 S.Ct. 340, 348, 90 L.Ed. 499 (1946).

We do not make the laws of war but we respect them so far as they do not conflict with the commands of Congress or the Constitution.

To do less would be to fail in our duty imposed by Congress in Article 67(d), UCMJ, 10 U.S.C. § 867(d), and to ignore the responsibility placed on us by the Supreme Court in *Burns v. Wilson, supra*, and its progeny.

## III

With respect to the issue particularly granted for review by this Court, we first must consider whether the Fourth Amendment requires, for a reasonable search of the person and property of a servicemember, the determination of a neutral and detached magistrate as mandated in civilian cases. As earlier indicated, the Constitution, Congress and the Supreme Court are silent as to this matter. The President, however, has established a procedure in paragraph 152 Manual for Courts-Martial, United States, 1969 (Revised edition), for a probable cause determination by a commanding officer. This Court has chosen in the past[9] to equate the commander of the base in making his probable cause determination under paragraph 152, Manual, *supra*, with the neutral and detached magistrate[10] required by the Fourth Amendment in civilian cases. This traditional and accepted analysis has increasingly become inappropriate to the military legal system and unresponsive to the proper constitutional question raised in the military context. *See Curry v. Secretary*, 439 F.Supp. 261 (D.D.C. 1977).

The touchstone for the constitutional propriety of a search under the Fourth Amendment in any circumstance is "reasonableness"[11] because the amendment on its face only prohibits those searches and seizures which are unreasonable. The Supreme Court in generally assessing the applicability of the protection of the Bill of Rights to military personnel on active duty has balanced such fundamental rights with the competing constitutional interests of military necessity as inherent to the war-making power of the President and as interpreted by the rule-making power of Congress.[12] I believe it unnecessary as well as increasingly in contradiction of common sense to equate the military commander in his duty to produce an effective fighting force and his concomitant responsibility as the chief law enforcement official on a military installation to a neutral and detached magistrate within the meaning of judge or magistrate in the civilian society. Such a legal fiction is counterproductive in assessing the realities of everyday military life and provides no viable standard for a determination of reasonableness under the Fourth Amendment. Nevertheless, this line of thinking will not *per se* disqualify him from lawfully ordering searches in all cases in the military society which do not otherwise run afoul of the balanced interests of the Fourth Amendment. What is unreasonable in the civilian society is not necessarily unreasonable in the military society due to the added factor, considered valid by the Supreme Court, of the competing constitution-

**9.** *United States v. Guerette*, 23 U.S.C.M.A. 281, 49 C.M.R. 530 (1975); *United States v. Staggs*, 23 U.S.C.M.A. 111, 48 C.M.R. 672 (1974); *United States v. Sam*, 22 U.S.C.M.A. 124, 46 C.M.R. 124 (1973); *United States v. Drew*, 15 U.S.C. M.A. 449, 35 C.M.R. 421 (1965), and cases cited therein.

**10.** *United States v. Chadwick*, 433 U.S. 1, 97 S.Ct. 2476, 53 L.Ed.2d 538 (1977); *Gerstein v. Pugh*, 420 U.S. 103, 95 S.Ct. 854, 43 L.Ed.2d 54 (1974); *Shadwick v. City of Tampa*, 407 U.S. 345, 92 S.Ct. 2119, 32 L.Ed.2d 783 (1972); *United States v. United States District Court*, 407 U.S. 297, 92 S.Ct. 2125, 32 L.Ed.2d 752 (1972); *Coolidge v. New Hampshire*, 403 U.S. 443, 91 S.Ct. 2022, 29 L.Ed.2d 564 (1971); *Warden v.*

*Hayden*, 387 U.S. 294, 87 S.Ct. 1642, 18 L.Ed.2d 782 (1967); *United States v. Ventresca*, 380 U.S. 102, 85 S.Ct. 741, 13 L.Ed.2d 684 (1965); *Jones v. United States*, 362 U.S. 257, 80 S.Ct. 725, 4 L.Ed.2d 697 (1960); *Johnson v. United States*, 333 U.S. 10, 68 S.Ct. 367, 92 L.Ed. 436 (1948).

**11.** *Coolidge v. New Hampshire, supra; Harris v. United States*, 331 U.S. 145, 150, 67 S.Ct. 1098, 91 L.Ed. 1399 (1947); *Go-Bart Importing Co. v. United States*, 282 U.S. 344, 357, 51 S.Ct. 153, 75 L.Ed. 374 (1931).

**12.** *See* footnote 5.

al interest of military necessity.[13] Accordingly, the question becomes whether requesting authority from the commanding officer is always the reasonable method to order a search in the military situation.

It must be pointed out that military necessity does not give rise to a constitutional authority in the military commander in his own right to authorize searches without compliance with the reasonableness requirement of the Fourth Amendment. I believe the military commander is a surrogate for the primary society in its constitutional right to be protected in person and property by the armed services from the threats or conduct of war by hostile forces. This uncontroverted legitimate national interest of the United States as well as certain facts of military life constitutionally and necessarily justify the denial of a neutral and detached civilian magistrate's decision for search and seizure for criminal evidence in military criminal cases. As earlier stated, however, all constitutional protection need not be sacrificed because of status in the armed forces. Paragraph 152, Manual, *supra*, is a response by the President to both this critical national interest and the residual individual rights of the servicemember.[14] As stated earlier, it is the responsibility of this Court to assess the reasonableness of this response to the remaining constitutional protection available to the serviceman within the constitutional context of the military justice system as appreciated by the Supreme Court.

Paragraph 152, Manual, *supra*, states in part that:

The following searches are among those which are lawful:

. . . . .

A search of any of the following three kinds which has been authorized upon probable cause by a commanding officer, including an officer in charge, having control over the place where the property or person searched is situated or found or, if that place is not under military control, having control over persons subject to military law or the law of war in that place:

(1) A search of property owned, used, or occupied by, or in the possession of, a person subject to military law or the law of war, the property being situated in a military installation, encampment, or vessel or some other place under military control or situated in occupied territory or a foreign country.

(2) A search of the person of anyone subject to military law or the law of war who is found in any such place, territory, or country.

(3) A search of military property of the United States, or of property of non-appropriated fund activities of an armed forced of the United States.

The commanding officer may delegate to persons of his command, or made available to him, the general authority to order searches upon probable cause, and a search ordered by virtue of any such delegation is to be considered as having been authorized by the commanding officer. Any such delegation should be made to an impartial person. The person who orders a search need not himself make or be present at the search.

The examples of lawful searches set forth above are not intended to indicate a limitation upon the legality of searches otherwise reasonable under the circumstances.

The promulgation of this particular procedure and its upholding as constitutional by this Court was based on several federal court cases which found similar conduct by a military commander reasonable government action under the Fourth Amendment.[15] These cases, however, involved

---

13. *Id.*

14. *See* Legal and Legislative Basis, Manual for Courts-Martial, United States, 1951, para. 152, and D. A. Pamphlet 27–2, *Analysis of Contents*,

Manual for Courts-Martial, United States, 1969 (Revised edition), para. 152.

15. *Best v. United States*, 184 F.2d 131 (1st Cir. 1950), *cert. denied* 340 U.S. 939, 71 S.Ct. 480,

searches and seizures of civilian and military personnel in foreign countries designated as war zones where no magistrate or judge was available to grant the order to search. Since that time military judges have been provided by Congress [16] and the system of military magistrates [17] as required by this Court on similar Fifth Amendment problems is in its initial stage of development. Accordingly, in view of these emerging facts of military life, I may find in the future that it is unreasonable that a military commander did not refer his decision to search in the usual case provided under paragraph 152, Manual, *supra,* for review and action by a military judge or magistrate where available.[18] Yet, as indicated in Judge Perry's opinion, there are other situations where a clear and present danger to the military mission exists which would preclude referral of the probable cause to search decision to those military officials designated as military judges or magistrates. Searches authorized by other appropriate military officials in this instance would be found reasonable under the well-established Fourth Amendment doctrine of exigent circumstances. Moreover, in those cases where no military judge or magistrate is available, I believe the procedure outlined in paragraph 152, Manual, *supra,* is eminently satisfactory and reasonable to authorize a lawful search for criminal evidence

under circumstances and conditions therein provided and enunciated in Judge Perry's opinion. All of these decisions solely with respect to their impact on the admission of evidence at a court-martial will be subject to judicial review for abuse of discretion in the trial court and appropriate appellate bodies.

IV

As for the immediate cases before this Court, I concur in their resolution by Judge Perry as reflecting the existing law as understood in the military justice system at this time. Henceforth, my resolution of these search and seizure issues on grounds of reasonableness will take into consideration the failure of the commander to refer his decision to search for review and action to a military judge or magistrate in those situations which the above analysis renders applicable.[19]

COOK, Judge (concurring in part and dissenting in part):

An undeviating line of cases in this Court has acknowledged that a commanding officer is qualified to act as a neutral and detached magistrate to authorize a search in the military community.[1] Every civilian case of which I am aware that has considered the matter has also reached that conclusion.[2] I unreservedly agree, there-

---

95 L.Ed. 677 (1951); *Richardson v. Zuppmann,* 81 F.Supp. 809 (D.Pa.1949), *aff'd* 174 F.2d 829 (3d Cir. 1949); *Grewe v. France,* 75 F.Supp. 433 (D.Wis.1948). *See also, United States v. Doyle,* 1 U.S.C.M.A. 545, 548, 4 C.M.R. 137 (1952).

16. *See* Article 26, Uniform Code of Military Justice, 10 U.S.C. § 826.

17. *Courtney v. Williams,* 1 M.J. 267 (C.M.A. 1976).

18. *See* footnote 30 of Judge Perry's opinion.

19. I do not read the decision in *Wallis v. O'Kier,* 491 F.2d 1323 (10th Cir. 1974), *cert. denied* 419 U.S. 901, 95 S.Ct. 185, 42 L.Ed.2d 147 (1974), as taking into consideration the existence or potential of military judges or military magistrates. Accordingly, I do not find its holding inapposite to my opinion or Judge Perry's.

1. *United States v. Guerette,* 23 U.S.C.M.A. 281, 49 C.M.R. 530 (1975); *United States v. Hous-*

*ton,* 23 U.S.C.M.A. 200, 201, 48 C.M.R. 952, 953 (1974); *United States v. Murray,* 12 U.S.C.M.A. 434, 31 C.M.R. 20 (1961); *see United States v. Florence,* 1 U.S.C.M.A. 620, 5 C.M.R. 48 (1952).

2. *United States v. Banks,* 539 F.2d 14, 16 (9th Cir. 1976), *cert. denied,* 429 U.S. 1024, 97 S.Ct. 644, 50 L.Ed.2d 626 (1976); *Wallis v. O'Kier,* 491 F.2d 1323 (10th Cir. 1974), *cert. denied,* 419 U.S. 901, 95 S.Ct. 185, 42 L.Ed.2d 147 (1974); *United States v. Head,* 416 F.Supp. 840, 844 (D.N.Y.1976); *United States v. Burrow,* 396 F.Supp. 890 (D.Md.1975); *United States v. Rogers,* 388 F.Supp. 298, 303 (D.Va.1975); *see also DeChamplain v. Lovelace,* 510 F.2d 419 (8th Cir. 1975), *judgment vacated with directions to dismiss as moot,* 421 U.S. 996, 95 S.Ct. 2392, 44 L.Ed.2d 644 (1975); *Saylor v. United States,* 374 F.2d 894, 898, 179 Ct.Cl. 151 (1967).

fore, that, as summarized in paragraph 152, Manual for Courts-Martial, United States, 1969 (Revised edition), a commanding officer is inherently qualified and empowered to authorize a search. *See* my opinion in *United States v. Roberts,* 2 M.J. 31, 36 (C.M.A.1976). I also agree, as is true of a judge or magistrate in the civilian community,[3] that personal interest in the outcome or previous conduct substantially incompatible with the requirement of neutrality can, in a particular instance, disqualify the commander.[4] I join, too, in the determination that the commander in *Ezell,* No. 31,304, was not disqualified to authorize the search at issue, but I disagree with the conclusion of disqualification in each of the other cases.[5]

As the difference in result between *Ezell* and the other cases emphasizes, the facts are determinative. However, previous cases have marked out guidelines that are useful to the decisional process; application of these leads me to conclude that all four cases should be affirmed.

*Ezell* makes no mention of them, but it exemplifies two guidelines. The first is that a commander is not disqualified because he has previous knowledge of information adverse to the person who is the

subject of the search. In *United States v. Smallwood,* 22 U.S.C.M.A. 40, 46 C.M.R. 40 (1972), the Court upheld an authorization to search by the commander, although the record showed that several days earlier he had learned the accused was involved in wrongful transactions with drugs.[6] The critical question, therefore, is not previous knowledge, but whether the information is likely to "lead . . . [the person issuing the search warrant] not to hold the balance nice, clear and true between the State and" the individual who will be affected by it. *Connally v. Georgia,* 429 U.S. 245, 249, 97 S.Ct. 546, 548, 50 L.Ed.2d 444 (1977). The second guideline is that a commander may consider information previously known to him in determining whether probable cause exists to justify a search.[7]

In *Ezell,* the commander testified he was not "even aware of the investigation [of accused] before" the investigators came to his office to request authorization to search, and he had not previously "been consulted on the Boyd buy." He did, however, know, as Judge Perry describes it, of "minor transgressions" and "illegal activities" by the accused, and he had initiated proceedings for accused's administrative discharge

---

3. *Connally v. Georgia,* 429 U.S. 245, 250, 97 S.Ct. 546, 50 L.Ed.2d 444 (1977); *Coolidge v. New Hampshire,* 403 U.S. 443, 91 S.Ct. 2022, 29 L.Ed.2d 564 (1971); *Vance v. North Carolina,* 432 F.2d 984 (4th Cir. 1970).

4. *United States v. Staggs,* 23 U.S.C.M.A. 111, 113, 48 C.M.R. 672, 674 (1974); *United States v. Dover,* 3 M.J. 764 (A.F.C.M.R.1977), *pet. granted* 4 M.J. 107 (1977); *see also United States v. Gordon,* 1 U.S.C.M.A. 255, 2 C.M.R. 161 (1952).

5. As indicated in note 50 of the principal opinion, in *Ezell,* besides the question of qualification to authorize a search, the Court granted review to consider whether the trial judge erred in denying a motion to return the charges to the convening authority to amend the Charge Sheet to indicate that the offenses were alleged as a violation of Article 92, rather than Article 134, Uniform Code of Military Justice, 10 U.S.C. §§ 892 and 934, respectively. *See United States v. Courtney,* 1 M.J. 438, 442 (C.M.A. 1976). I agree that the issue was resolved against the accused by *United States v. Jackson,* 3 M.J. 101 (C.M.A.1977).

6. *See also United States v. Gamboa,* 23 U.S.C. M.A. 83, 48 C.M.R. 591 (1974); *United States v. Gibbins,* 21 U.S.C.M.A. 556, 45 C.M.R. 330 (1972); *United States v. Rosado,* 2 M.J. 763 (A.C.M.R.1976), *pet. denied* 5 M.J. 1091 (1976); *United States v. Garay,* 2 M.J. 460 (A.C.M.R. 1975), *pet. denied* 5 M.J. 1116 (1976).

In his dissent in *United States v. Staggs, supra* 22 U.S.C.M.A. at 115, 48 C.M.R. at 676, Judge Quinn observed that "the civilian magistrate and . . . [his military counterpart] may know of previous aborted proceedings against a particular suspect," but that "knowledge alone would not disqualify . . . [a commander] from acting on a new application for a warrant."

7. *United States v. Gill,* 23 U.S.C.M.A. 176, 48 C.M.R. 792 (1974); *United States v. Gamboa, supra; United States v. Lidle,* 21 U.S.C.M.A. 455, 45 C.M.R. 229 (1972); *United States v. Jeter,* 21 U.S.C.M.A. 208, 44 C.M.R. 262 (1972); *United States v. Miller,* 21 U.S.C.M.A. 92, 44 C.M.R. 146 (1971).

for unsuitability. Tested by the guidelines mentioned above, neither singly nor in combination do these circumstances impress me as having such significance and weight as to incline a commanding officer in general, or the commander in *Ezell* specifically, to abandon his position as a neutral and detached magistrate in acting on the application for the warrant.[8]

Turning to *Boswell,* No. 32,414, my initial disagreement with the majority rests on the absence of objection at trial to the disqualification of Major Moi to authorize the search. The objections interposed were only as to the reliability of the informant and the scope of the search. Our cases, which, I believe, are soundly based, establish that, unless a manifest miscarriage of justice would result, the failure to object at trial on a particular ground forecloses review of that ground as a basis for reversal by this Court. *United States v. Gebhart,* 10 U.S.C.M.A. 606, 28 C.M.R. 172 (1959); *United States v. Dupree,* 1 U.S.C.M.A. 665, 5 C.M.R. 93 (1952).

On the merits, the principal opinion identifies the following circumstances to support the conclusion that Major Moi was disqualified to act as a neutral magistrate:

1. Some time previous to the search, Major Moi received information from "several sources" that the accused was "dealing in narcotics."

2. About 3 months before the search, Major Moi imposed Article 15 punishment on the accused for wrongful possession of marijuana.

3. About 2 weeks before the search, Major Moi entered the accused's room and found him "in the midst of a 'pot party.'" [It should be noted that the accused shared the room with Private Volinte, who was the company armorer. Major Moi went there to obtain from Volinte the key to the arms room. He knocked on the door and it was opened. The lights were out, but the Major recognized the accused and noted the presence of two other persons. A strong odor of marijuana or hashish pervaded the room. On entering, the Major observed a "kilo scale." In his testimony at trial, he conceded he "should have searched the room at that time," but he did not; instead, he only "grabbed the scale" and left.]

4. On December 3, 1974, Major Moi was informed the accused was going to sell marijuana later that day to two enlisted men who were gate guards, and, that, in his visit to the accused's room the previous day, the informant had seen marijuana in the drawer of a desk in the accused's room.

5. Major Moi authorized a search of the accused's room and that of the gate guards.

6. "Major Moi personally conducted the search" of the accused's room, in the accused's presence.

As noted in my discussion of *Ezell,* previous knowledge of the accused's involvement in illegal conduct does not disqualify a com-

---

8. While not material to the *Ezell* decision, a passage in note 46 of Judge Perry's opinion merits separate comment. Judge Perry remarks that "there is no showing that Colonel Cross was involved in the investigative process . . . or that he personally dispatched the informant to Ezell's room or that he was otherwise involved in the business of ferreting out evidence of crime." As each circumstance is stated in the alternative, it appears to imply that had Colonel Cross dispatched the informant to Ezell's room, he would have been disqualified to authorize the search, and would, thereby, also have somehow made the search itself *illegal.* I disagree with those comments as inconsistent with the following statement from the opinion of the Court in *United States v. Staggs, supra,* 22 U.S.C.M.A. at 114, 48

C.M.R. at 675, which was reaffirmed in *United States v. Guerette, supra* 23 U.S.C.M.A. at 282–83, 49 C.M.R. at 531–32:

> We are well aware that a commander's responsibility for the maintenance of order and discipline in his command requires that he direct and sometimes participate in investigations into criminal activities. He is also the individual empowered to issue search authorizations on probable cause. Nothing in this decision is intended to invalidate this longstanding practice, as we are certain that, in the ordinary course of events, a commander is able to separate his responsibilities and maintain the requisite judicial attitude toward making determinations of the existence of probable cause.

mander from issuing a warrant to search the accused or his effects when presented with current facts establishing probable cause. Consequently, I do not regard the facts set out in 1, 2 and 3 above, as disabling. As to 4 and 5, it is equally manifest that receipt of information providing probable cause to order a search in connection with an application for the order cannot disqualify an otherwise competent commander; nor does issuance of an authorization to search on such information constitute a disqualification. Disqualification in this case, therefore, must rest upon the single fact set out in 6 above, specifically, that "Major Moi personally conducted the search."

Until now, it has never been held by any court, to my knowledge, that a warrant, valid because properly authorized by a competent official, is vitiated, retroactively, because the official later personally carries out the search. It seems to me that disqualification to issue a warrant must exist at the time of the issuance, not at some later occasion. True, subsequent conduct of a disqualifying nature may be of a kind to support an inference that the disqualification existed at an earlier time (*see* para. 138 *a,* Manual, *supra* ), but in military tradition and law, a search determined to be necessary by a qualified commander can be personally conducted by him, without impugning his qualification or rendering the search itself illegal. As the Court pointed out in the first search and seizure case it considered: "There has long existed in the services a rule to the effect that a military commanding officer has *the power to search military property within his jurisdiction.*" *United States v. Doyle,* 1 U.S.C.M.A. 545, 547, 4 C.M.R. 137, 139 (1952) (emphasis supplied). The Court has consistently recognized that the power to search means the power to conduct the search personally. For example, in *United States v. Murray,* 12 U.S.C.M.A. 434, 436–37, 31 C.M.R. 20, 22–23 (1961), the Court said:[9]

The commanding officer . . . , upon the determination that probable cause exists so to act, [is] authorized under military law *either personally to conduct a search of the quarters and property of a member of his command* or to cause such an examination to be carried out by another. [Emphasis supplied.]

The United States Constitution is silent as to the execution of a search warrant. In the federal civilian community, the rules provide for the judge or the magistrate to direct "a civil officer of the United States authorized to enforce or assist in enforcing any law thereof" to execute a warrant. Fed.R.Crim.P. 41; *see also* 4(d). That rule does not mean that it is constitutionally impermissible for a judge to attend a search to be conducted under a warrant he has properly issued. In *United States v. Duncan,* 420 F.2d 328 (5th Cir. 1970), the United States Commissioner (now magistrate) issued a search warrant; he then accompanied the officers to the premises for the search. Considering the effect of this action, the court said (*id.* at 331):

The fact that the Commissioner accompanied the officers on the raid is not sufficient to impugn his neutrality or detachment. His act was somewhat similar to visits often made by judges to places of imprisonment. It may indeed be a healthy interest on the part of a judge or magistrate actually to see the manner in which his orders are carried out. The proof does not remotely indicate that, in issuing the search warrant, the Commissioner did not act as a neutral and detached magistrate.

In footnote 53, the principal opinion states, in conclusory form, that "*Duncan* is not applicable here." It also goes on to imply that the *Duncan* rationale was negated by the United States Supreme Court in *Shadwick v. City of Tampa,* 407 U.S. 345, 350, 92 S.Ct. 2119, 32 L.Ed.2d 783 (1972). *Shadwick* dealt only with "[t]he single ques-

9. *See also United States v. Cady,* 22 U.S.C.M.A. 408, 47 C.M.R. 345 (1973); *United States v. Crow,* 19 U.S.C.M.A. 384, 41 C.M.R. 384 (1970); *United States v. Dollison,* 15 U.S.C.M.A. 595, 36 C.M.R. 93 (1966); *United States v. Weaver,* 9 U.S.C.M.A. 13, 16–17, 25 C.M.R. 275, 278–79 (1958).

tion . . . whether power has been lawfully vested, not whether it has been constitutionally exercised." *Id.* at 352, 92 S.Ct. at 2124. In *Duncan*, as in this case, there is no doubt whatever that the power to authorize a search was lawfully vested. What the Court of Appeals was concerned with in *Duncan*, and what this Court is concerned with here, is the effect of the "magistrate's" presence at the scene of a search which he has authorized upon the legality of the exercise of his authority. That question was not answered in *Shadwick*. I believe, as I shall point out below, that it was answered later by the Supreme Court in a way consistent with *Duncan*.

Mindful of the fact that a right to supervise an activity may not necessarily include the right to carry it on personally, and aside from the question whether the special position of a commander in the military community sanctions a search conducted by him, reflection on the opinions of the state court in *People v. Heller*, 29 N.Y.2d 319, 327 N.Y.S.2d 628, 277 N.E.2d 651 (1971), and that of the Supreme Court in *Heller v. New York*, 413 U.S. 483, 488, 93 S.Ct. 2789, 37 L.Ed.2d 745 (1973), convinces me that the magistrate may properly take independent action to assure himself that a search is carried out within the terms of his authorization.

In *Heller*, on a report by three police officers about a movie they had seen, in part, at a public theater, an assistant district attorney asked a judge to view the movie to determine whether it was obscene, and, therefore, unshowable in public, by state law. Accompanied by a police inspector, the judge went to the theater, purchased a ticket, and witnessed the entire movie. Immediately, he signed a warrant authorizing seizure of the film and arrest of the manager, the ticket taker, and projectionist. The state courts and the United States Supreme Court upheld the seizure. Although their respective opinions deal, primarily, with the necessity, under the First and Fourth Amendments, for "an adversary hearing prior to [any] seizure," I read them to sanction the visit by a judge to a place to be searched, in order to satisfy himself by personal observation of the evidence of the alleged criminal act. *Heller*, is an elaboration of the concept in *United States v. Duncan, supra.* I have no doubt, therefore, that after proper issuance of a warrant, a judge can personally assure himself of the lawful execution of the warrant.[10]

In summary, the question in *Boswell* is whether the commander's action is compatible with "a 'judicial' rather than a 'police' attitude." *United States v. Drew*, 15 U.S.C. M.A. 449, 454, 35 C.M.R. 421, 426 (1965). In my judgment, a search authorized by a qualified commander, on the basis of facts demonstrating probable cause therefor, is not rendered illegal because made by the commander personally. As the commander's action was, in all other respects, unimpeachable, I would sustain the trial judge's ruling admitting into evidence the results of that search, and I would affirm the decision of the Court of Military Review.

For *Sanchez*, No. 33,326, I have set out the operative facts as detailed by the majority.[11]

1. Major Dube's unit "experienced a high rate of narcotics usage." In order "to purge" the unit of drugs, he "authorized and personally participated in . . . 'sweeps' of the barracks . . . with marihuana detection dogs.

2. On March 20, the Major conducted a "walk through" of the barracks accompanied by a dog, a group of military policemen, and the accused who served "as the search team's clerk and runner."

---

10. Assuming the doctrine of separation of powers applies to the military, I do not regard it as prohibiting independent action by a judge in the execution of a warrant issued by him as he is also obligated to determine the validity of the execution.

11. In addition to the search issue, we granted review to consider two other questions. The first concerns the legality of the use of a marijuana detection dog. In my opinion there is no merit in this assignment. *United States v. Roberts*, 2 M.J. 31, 36 (C.M.A.1976). The second question is whether the accused consented to the search; I consider it in my discussion of the search issue.

3. The dog alerted at the accused's locker. The Major was informed of that and signed a search warrant. An agent advised the accused of his rights.

4. The accused's locker was searched by an agent, and marijuana and heroin were found.

I note here, as I did in *Boswell*, that the accused did not challenge the validity of the search on the ground of Major Dube's disqualification. Consequently, I believe the question of disqualification is not now open to review. Additionally, as in *Boswell*, the record justifies, in my opinion, affirmance of the trial judge's ruling. The basis here is an express finding by the trial judge that the accused had voluntarily consented to the search. When the record was before it, the Court of Military Review elected not to consider consent as a ground upon which to predicate its affirmance of the trial ruling. Our grant of review indicates this election does not foreclose our own consideration of the matter. Reviewing the record, I am satisfied there is ample evidence to support the trial judge's finding of consent. A search based upon consent obviates the need to examine Major Dube's qualification to authorize a search.

As to the ground relied upon by the majority, I have no doubt whatever that a commander can initiate a program of inspection of premises and other property within his command without compromising his qualification to order a search predicated upon information learned in the course of that inspection. *See* my opinion in *United States v. Thomas*, 1 M.J. 397, 401 (C.M.A. 1976). In *United States v. Staggs*, 23 U.S. C.M.A. 111, 114, 48 C.M.R. 672, 675 (1974), the Court explicitly acknowledged and approved the "long-standing practice" under which a commander can "direct and sometimes participate in investigations into criminal activities," without impairing his

later ability to act as a magistrate in authorizing a search. Consequently, as far as the facts mentioned in 1, 2 and 3 above are concerned, they do not, under our cases, establish disqualification. What remains is Major Dube's presence at the place at which the search was carried out.

Earlier, I set out my conviction that a commander can personally carry out a search without compromising either his previous authorization of search or the search itself. In my view, therefore, the lesser involvement, if it is such, of presence at the scene does not negate the authorization or make the search illegal. Our cases support that view.[12] *People v. Heller, supra*, supports that view; and the excerpt from *United States v. Duncan, supra*, set out in my discussion of the *Boswell* case is particularly instructive. I would, therefore, sustain the trial judge's ruling and affirm the decision of the Court of Military Review in *Sanchez*.

Turning to the merits[13] of *Brown*, No. 33,679, the principal opinion specifies four general sets of circumstances to support the conclusion that Colonel Wehling, the base commander, was disqualified to authorize the search. These are:

1. Colonel Wehling approved a request by OSI agents that Sergeant Fox, a member of his command, be allowed to report to the agents his observations of drug transactions on the base and that he participate in "controlled" purchases of such substances. It was anticipated that Fox's observations and actions would lead to prosecution of persons engaged in drug activity on the base.

2. Colonel Wehling "often" approved the equipment of Sergeant Fox "with electronic listening devices."

3. For several months before the incidents that led to accused's prosecution, "all information" received by the agents

12. *See United States v. Smallwood*, 22 U.S.C. M.A. 40, 46 C.M.R. 40 (1972); *United States v. Aloyian*, 16 U.S.C.M.A. 333, 36 C.M.R. 489 (1966); *United States v. Hartsook*, 15 U.S.C. M.A. 291, 35 C.M.R. 263 (1965); *United States v. Insani*, 10 U.S.C.M.A. 519, 28 C.M.R. 85 (1959); *United States v. Bennett*, 7 U.S.C.M.A.

97, 100, 21 C.M.R. 223, 226 (1956). *See also* note 9 *supra*.

13. A third assignment of error, which relates only to the sentence, was decided against the accused in *United States v. Jackson, supra*.

from Fox was given to Colonel Wehling; sometimes the Colonel was present when Fox "gave his information," and the Colonel "gave him [Fox] directions concerning his further activities."[14]

4. Colonel Wehling authorized the search. In that connection, I think it appropriate to note, additionally, the following excerpt from his testimony:

Q (ATC). Did you have any role in selecting who would be involved in their investigation, or who would be the subject of a controlled buy, in the selection of those individuals?

A. No.

Q. Did you have any role in directing the course of the operation, either in general or in specifics; the actual plan or direction of the operation?

A. Which operation are you talking about?

Q. The total operation involving Sergeant Fox?

A. No.

The majority conclude that because of "personal involvement in the investigative activities of the OSI agents and their informant, . . . Colonel Wehling was not . . . disengaged from law enforcement activities" and was thus disqualified from issuing the authorization to search. Certainly, the Colonel was "personally" involved, but, in my opinion, he was involved as a commander, not as a police investigator.

The Omnibus Crime Control and Safe Streets Act of 1968 provides that a judge authorizing interception of any wire or oral communication "may require reports to be made . . . [to him] showing what progress has been made toward achievement of the authorized objective and the need of continued interception." 18 U.S.C. § 2518(6). "[T]he degree of judicial supervision" of the agents' interception "is an important factor in determining whether a good faith effort to minimize was attempted." Consequently, close and conscientious supervision by the judge is commendable, not condemnatory. *United States v. Bynum,* 485 F.2d 490, 501 (2d Cir. 1973), *cert. denied,* 423 U.S. 952, 96 S.Ct. 357, 46 L.Ed.2d 277 (1975). To my knowledge, no one has ever challenged or suggested that this supervisory provision is unconstitutional because it transforms the judge into an investigator. Here, the agents' application to Colonel Wehling to authorize the use of electronic equipment on the person of Sergeant Fox impresses me as a laudable endeavor to assure "judicial" sanction of the use of such equipment. I, therefore, perceive the Colonel's grant of authority for use by a member of his command as eminently consistent with his responsibility as a commander acting as a neutral and detached magistrate. Similarly, I regard the Colonel's receipt of periodic reports on the progress of the investigation, not as involving him in the ferreting out of evidence of a crime, but as indicative of his independent role as a commander, responsible for, and entitled to, information about criminal activity within his command. Surely, a Chief Judge of a court would not be disqualified from issuing a search warrant in an investigation into acceptance of a bribe because he had previously been advised that an investigation had been initiated; that an administrative clerk of the court was the subject of the investigation; and that he had been periodically informed of the results of the investigation as it progressed, to the day of the application for the warrant. In *United*

14. I believe that, in determining the disqualification issue which was raised at trial, the judge could find the facts to be somewhat different from those enumerated in this subdivision. For example, both Sergeant Fox and Colonel Wehling testified they had a meeting on April 17th. The purpose of this meeting, as testified to by Sergeant Fox, was "[b]asically . . . a debrief of . . . [his] knowledge pertaining to . . . activities within the last week of certain individuals [including the accused] that were involved with drugs." According to the Colonel, the discussion was "an up dating" on Fox's observations and activities. During Colonel Wehling's testimony he was asked, "Prior to the 17th, had you ever met Fox personally?"; his answer was, "No." My view of the issue, however, makes it unnecessary to record my perceptions of sustainable findings by the trial judge which are different from those relied upon by the majority.

*States v. Guerette,* 23 U.S.C.M.A. 281, 283, 49 C.M.R. 530, 532 (1975), a unanimous Court held that a commander's receipt of "periodic briefings" as to an ongoing investigation into drug activity within his command did not convert him into an active participant in the process of ferreting out the criminal evidence.

As to the majority's reliance on the undescribed "directions" to Sergeant Fox as a disqualifying circumstance, I believe *United States v. Bynum, supra,* provides a controlling answer. With the Court of Appeals in that case, I believe a "judicial" officer is to be commended, not censored, for insuring that those engaged in the investigation of crime comport themselves as required by law. Finally, in *United States v. Wallace,* 5 M.J. 69 (C.M.A.1976), this Court held that authorization by a commander of the use of a member of his command as an undercover informant does not impugn his qualification to exercise his judicial responsibility to review a conviction. Similarly, such action does not, in my opinion, disqualify the commander from exercising his judicial authority to order a search.

Reviewing the totality of the circumstances in *Brown,* I am satisfied that throughout the proceedings in issue, the commander was qualified to authorize a search and to be present at the place it was carried out. I would, therefore, affirm the decision of the Court of Military Review in that case, as I have in all the others.